**NORCOM ELECTRONICS CORPORATION,**
Plaintiff,

v.

**CIM USA INC. and CIM S.p.A., Defendants.**

**No. 99Civ.10559(SHS).**

United States District Court, S.D. New York.

June 5, 2000.

Jeffrey Daichman, Dana M. Susman, Kane Kessler, P.C., New York City, for Norcom Electronics Corp.

*OPINION*

STEIN, District Judge.

In late 1996, plaintiff Norcom Electronics Corporation ("Norcom") and defendant CIM S.p.A. entered into a distributor agreement (hereafter, the "Distributor Agreement," or the "Agreement") pursuant to which Norcom was to be the exclusive distributor, throughout most of North America, of machines and supplies manufactured by CIM S.p.A. for use in embossing plastic cards and metal plates. After relations between these parties disintegrated and the agreement expired, Norcom brought this action against CIM S.p.A. and its subsidiary CIM USA Inc. (collectively, "CIM"), alleging tortious interference with Norcom's contractual relations with its dealers and customers, violations of the Lanham Act and the New York General Business Law, and a number of common law claims.

Subsequently, CIM moved to compel arbitration of these claims and to stay litigation pending the arbitration, and Norcom cross-moved for a preliminary injunction requiring specific performance of certain duties and obligations pursuant to the Distributor Agreement pending a resolution of the merits. For the reasons set forth below, CIM's motion to compel arbitration is granted in part and denied in part, CIM's motion for a stay is granted in full, and Norcom's motion for a preliminary injunction is granted in part and denied in part.

**BACKGROUND**

Since 1988, Norcom Electronics Corporation has been engaged in the business of designing, marketing, selling, and distributing plastic card and metal plate embossing machines throughout the United States and elsewhere. CIM S.p.A. is an Italian company engaged in the business of manufacturing and distributing embossing machines throughout the world, and CIM USA, Inc. is a subsidiary of CIM S.p.A. Plastic card embossing machines are widely used in the hospital industry for creating patient identification tags, while metal embossing machines are commonly used in the automotive industry and the military for producing license plates and dog tags, respectively.

On or about December 31, 1996, Norcom and CIM S.p.A. entered into a Distributor Agreement that designated Norcom as the exclusive distributor throughout the United States and most of North America of embossing products manufactured by CIM S.p.A. *See* Aff. of W. Bruce Hansen Ex. B (the Agreement). The initial term of the Agreement was two years, with automatic renewal for additional terms of one year, absent notice of termination from one of the parties at least 180 days before the end of the current term. *See id.* at 2, ¶ 3.1. In June 1998, CIM S.p.A. notified Norcom of its intent to terminate the Agreement and to negotiate a new relationship between the parties, including the possible acquisition of Norcom's business. Those negotiations were unsuccessful, however, and the Agreement terminated on February 28, 1999.

Eight months later, Norcom brought this action against CIM S.p.A. and CIM USA Inc., alleging that these defendants engaged in an illegal course of conduct designed to frustrate Norcom's conduct of

its own business and to permit defendants to usurp Norcom's role in the embossing machine market. These allegations are set forth in the following eight causes of action, each of which is asserted to implicate compensatory damages of not less than $5 million:

(1) tortious interference with Norcom's contractual relations with dealers and end-users of the embossing machines;

(2) false designation of origin and description, through illegal use of Norcom's trademark, in violation of the Lanham Act, 15 U.S.C. § 1125(a);

(3) dilution of Norcom's "famous" trademark in violation of the Lanham Act, 15 U.S.C. § 1125(c);

(4) deceptive acts and practices in violation of New York General Business Law § 349;

(5) violation of New York General Business Law § 360-1;

(6) unfair competition in violation of New York common law;

(7) conspiracy in violation of New York common law; and

(8) breach of contract in violation of New York common law.

Prior to discovery, CIM moved to compel arbitration and to stay this action pending arbitration. Norcom then cross-moved for preliminary injunctive relief requiring CIM to perform certain duties and obligations pursuant to the Distributor Agreement.

## DISCUSSION

### I. CIM's motion to compel arbitration and to stay litigation

The Federal Arbitration Act ("FAA") provides that "an agreement in writing to submit to arbitration an existing controversy ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Since the passage of the FAA federal courts have recognized a "strong federal policy favoring alternative means of dispute reso-

lution," *Oldroyd v. Elmira Sav. Bank. FSB*, 134 F.3d 72, 76 (2d Cir.1998), and, in light of that policy, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *accord Ahing v. Lehman Bros., Inc.*, 1997 WL 634290, at *1 (S.D.N.Y. Oct. 14, 1997). "This 'emphatic federal policy in favor of arbitral dispute resolution' 'applies with special force in the field of international commerce.'" *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 847 (2d Cir.1987) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 630–34, 105 S.Ct. 3346, 3356–57, 87 L.Ed.2d 444 (1985)).

Four factors must be considered in determining whether to compel arbitration pursuant to the FAA: first, did the parties agree to arbitrate; second, what is the scope of the arbitration agreement; third, did Congress intend the federal statutory claims asserted by the plaintiff to be nonarbitrable; and fourth, if only certain of the claims are arbitrable, should the court stay the balance of the proceedings pending arbitration. *See id.* at 844; *see generally Arakawa v. Japan Network Group*, 56 F.Supp.2d 349, 352 (S.D.N.Y.1999).

### A. Existence of an agreement to arbitrate

There is no dispute that Norcom and CIM S.p.A. agreed to arbitrate. In pertinent part, Article 22.7 of the Distributor Agreement provides as follows:

Any controversy or claim arising out of or relating to this Agreement or breach thereof, shall be settled by arbitration in accordance with the CONCILIATION and ARBITRATION rules of the INTERNATIONAL CHAMBER OF COMMERCE OF ZURICH, SWITZERLAND, without recourse to the ordinary Courts, by one or more arbitrators appointed according to the said rules, whose judgment shall be binding.

Aff. of Hansen Ex. B at 15, ¶ 22.7 (emphasis in original).

■ Norcom contends that this arbitration clause is not binding with respect to its disputes with CIM USA Inc., which was not a signatory to the Agreement and, in fact, was incorporated only after CIM S.p.A. and Norcom entered into it. However, the U.S. Court of Appeals for the Second Circuit and other circuits "'have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Smith/Enron Cogeneration Ltd. Partnership v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97–98 (2d Cir.1999) (quoting *Thomson–CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 779 (2d Cir.1995) (collecting cases)).

Several reasons support the application of this theory of estoppel to this motion. First, there is a close and direct relationship between the defendant entities in this case; namely, CIM USA Inc. is a wholly owned subsidiary of CIM S.p.A. Second, as discussed in greater detail below, the claims asserted against CIM USA Inc. are closely intertwined with duties and obligations arising under the Distributor Agreement. Third, it would be inequitable to permit Norcom to assert the Agreement as a basis for bringing suit against CIM USA Inc., and at the same time to allow Norcom to circumvent the arbitration clause within that same Agreement with respect to its dispute with CIM USA Inc. *See generally Fluor Daniel Intercontinental, Inc. v. General Elec. Co.*, No. 98 Civ. 7181, 1999 WL 637236, at *6–7 (S.D.N.Y. Aug. 20, 1999).

Accordingly, the arbitration clause in Article 22.7 of the Distributor Agreement binds all the parties to this action.

**B. Scope of the arbitration clause**

■ Next, this Court must consider whether the arbitration clause encompasses the claims asserted by Norcom in the complaint. Because federal public policy strongly favors arbitration, a court presented with a valid agreement to arbitrate must "compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir.1995) (quoting *Threlkeld*, 923 F.2d at 250); *see Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. at 3354.

■ As an initial matter, this Court must "decide at the outset whether 'the arbitration agreement is broad or narrow.'" *Collins & Aikman Prods. Co.*, 58 F.3d at 20 (quoting *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir. 1983)). As noted above, Article 22.7 of the Distributor Agreement requires arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement or breach thereof." Such a clause constitutes "the paradigm of a broad clause," *id.*, and the following analysis therefore applies:

> [I]f ... the dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the presumption [of arbitrability] by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it. If the answer is yes, then the collateral dispute falls within the scope of the arbitration agreement; claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement.

*Id.* at 23. Accordingly, courts must " 'focus on the allegations in the complaint rather than the legal causes of action asserted'. If the allegations underlying the claims 'touch matters' covered by the parties' agreement[ ], then those claims must be arbitrated, whatever the legal labels

attached to them.'" *Id.* at 20–21 (quoting *Genesco,* 815 F.2d at 846).

### 1. Tortious interference claim

■ Norcom's first claim alleges that CIM tortiously interfered with Norcom's business relationships with its dealers by refusing to fulfill its duties and obligations under the Agreement in order to frustrate Norcom's business transactions with those dealers and by incorporating CIM USA Inc. in New York as a means of targeting the United States market, and that CIM took further specific steps to misappropriate Norcom's business and goodwill within the U.S. market. *See* Compl. ¶¶ 17–34.

To the extent that these allegations address specific breaches of the Distributor Agreement by CIM as part of its efforts to interfere with Norcom's contractual relations, this claim plainly touches upon matters covered by the Agreement and is therefore arbitrable. *See Collins & Aikman Prods. Co.,* 58 F.3d at 22; *Genesco,* 815 F.2d at 856. Here, for example, a number of the allegations in Norcom's tortious interference claim track the allegations in its breach of contract claim in the complaint: that CIM refused to provide Norcom with new and/or updated embossing machines, *see* Compl. ¶¶ 31(c), 100; that CIM substantially delayed the delivery of embossing machines, *see id.* ¶¶ 31(d), 98; that CIM substantially delayed the delivery of replacement parts, *see id.* ¶¶ 31(e), 98, 112; that CIM refused to advise Norcom of various prices in a timely manner and/or increased agreed upon prices, *see id.* ¶¶ 31(f), 96, 112; and that CIM refused to accept purchase orders from CIM, *see id.* ¶¶ 31(g), 110. These assertions "clearly allege[ ] conduct that would be wrongful in respect of the subject matter of the" Distributor Agreement. *Collins & Aikman Prods. Co.,* 58 F.3d at 22.

■ To the extent that CIM's alleged actions caused harm to Norcom beyond its loss under the Distributor Agreement, CIM may be liable to Norcom on the theory, and to the extent, that such conduct relates to the Distributor Agreement or a breach thereof. *See id.* at 22–23. Although Norcom contends that Second Circuit precedent disfavors arbitration of tort claims, any possible doubts raised by that court's earlier cases have been resolved by its more recent statement that "[t]he mere fact that this is a tort claim, rather than one for breach of [contract], does not make the claim any less arbitrable." *Id.* at 23 (collecting cases); *accord Mehler v. Terminix Int'l Co. L.P.,* 205 F.3d 44, 50 (2d Cir.2000); *Genesco,* 815 F.2d at 855; *see also Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machines, Local Union No. 550,* No. 96 CV 4454, 1998 WL 19974, at *6–8 (E.D.N.Y. Jan. 20, 1998), *aff'd,* 167 F.3d 764 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 68, 145 L.Ed.2d 58 (1999). Moreover, the fact that the arbitration clause broadly encompasses "[a]ny controversy or claim arising out of or relating to this Agreement or breach thereof" belies Norcom's argument that the clause excludes tort claims collateral to the Distributor Agreement itself. Had Norcom wished to exclude such collateral claims from arbitration, it could have bargained for a narrower clause. *See Rochdale Village, Inc. v. Public Serv. Employees Union, Local No. 80,* 605 F.2d 1290, 1296 (2d Cir.1979); *Sodemo, S.A. v. Chase Manhattan Bank,* No. 95 Civ. 2944, 1995 WL 746382, at *3 (S.D.N.Y. Dec. 15, 1995).

In this context, Norcom maintains that additional factual allegations underlying the tortious interference claim, *see* Compl. ¶ 31, do not "relate to" the Distributor Agreement. This is simply not the case, however. First, the alleged misuse of confidential information relates to the Agreement's confidentiality provision. *See* Aff. of Hansen Ex. B at 13, ¶ 20.1. Similarly, Norcom's allegations that CIM improperly modified the embossing machines touch upon matters covered by the modifications provision. *See id.* at 10, ¶ 11.1. Finally, CIM's allegedly misleading statements to

Norcom's dealers and customers with respect to the termination of the Agreement, as well as Norcom's plans and ability to distribute machines, plainly relate to the requirements that CIM maintain Norcom "as its exclusive distributor" and that Norcom "use its best efforts to promote, sell and distribute" the machines. *Id.* at 2, ¶¶ 3.1, 3.2.1.

■ Norcom also contends that the arbitration clause cannot fully encompass its tortious interference claim because this claim relies in part on the allegation that CIM solicited Norcom's key employees, including the Director of Engineering responsible for developing its embossing machine. *See* Compl. ¶ 31(j). Here, Norcom points to numerous Second Circuit decisions holding "that a claim for tortious interference with employment contracts does not arise under or relate to a separate sales agreement." *Collins & Aikman Prods. Co.*, 58 F.3d at 22 (citation and internal quotation marks omitted); *accord Genesco*, 815 F.2d at 856; *Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd.*, 385 F.2d 158, 159 (2d Cir.1967). In the present case, although the Agreement does require Norcom to "maintain a sufficient sales and service organization to adequately meet the needs of all Customers," Aff. of Hansen Ex. B at 3, ¶ 3.2.2, the nexus between this clause and CIM's allegedly improper solicitation of Norcom employees is simply too attenuated to indicate that the parties "reasonably could have expected, or even contemplated, that that clause ... would extend" to such an allegation, *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28–29 (2d Cir.1995). Therefore, this Court finds that the arbitration clause does not encompass the allegation that CIM solicited Norcom employees, although the remainder of Norcom's tortious interference claim is subject to the arbitration clause in the Distributor Agreement. *See Collins & Aikman Prods. Co.*, 58 F.3d at 20.

## 2. Lanham Act claims

■ The complaint pleads Norcom's second claim (false designation of origin) and its third claim (trademark dilution) in terms of CIM's use of Norcom's trademarks in the names "Maxima" and "1700" with respect to embossing machines, allegedly in violation of the Lanham Act, 15 U.S.C. § 1125. *See* Compl. ¶¶ 41–56, 57–66. Although the Distributor Agreement appears to address only the trademark in the name "Norcom" and not the marks "Maxima" or "1700," *see* Aff. of Hansen Ex. B at 10, ¶ 9.2, Norcom has made the following allegations in the context of its breach of contract claim:

> 107. Since the termination of the Distributor Agreement, and continuing to the present time, *both CIM Italy and CIM USA have used, and continued to use the Trademarks* without Plaintiff's license, authorization or consent in connection with its manufacture, marketing, distribution and sale of plastic card and metal plate embossing machines, *all in violation of paragraph 9.2 of the Distributor Agreement.*

Compl. ¶ 107 (emphasis added).

■ Because the quoted paragraph asserts that CIM has used more than one trademark in violation of the Distributor Agreement, Norcom's allegations must rely on the premise that Article 9.2 of the Agreement is not limited strictly to the single trademark in the name "Norcom." Given that the only trademarks mentioned anywhere in the complaint are in the names "Maxima" and "1700," this Court simply cannot state "with positive assurance" that the Agreement is not susceptible of an interpretation that covers the trademarks implicated by the Lanham Act claims. *Collins & Aikman Prods. Co.*, 58 F.3d at 19 (quotation omitted). The fact that the parties may ultimately contest such an interpretation "does not change the nature of the dispute," *American Diagnostica of Conn. Inc. v. Centerchem, Inc.*, No. 94 Civ. 7047, 1996 WL 71494, at *3 (S.D.N.Y. Feb. 20, 1996), since a claim

that implicates questions of contract construction necessarily falls within the scope of a broad arbitration clause within that contract, *see Collins & Aikman Prods. Co.,* 58 F.3d at 23. Therefore, this Court finds that the arbitration clause encompasses Norcom's claims pursuant to the Lanham Act.

### 3. New York General Business Law claims

Next, the fourth and fifth claims in the complaint allege violations of New York General Business Law §§ 349 and 360–1. *See* Compl. ¶¶ 67–73, 74–80. However, the complaint pleads these claims not in terms of independent factual allegations but rather through incorporation of earlier allegations by reference. *See id.* Therefore, these claims relate to the Distributor Agreement to the extent they rest on incorporated allegations that themselves relate to the Agreement. Because the incorporated allegations were considered above and were found to relate to the Distributor Agreement, the Agreement's arbitration clause similarly encompasses these New York statutory claims.

### 4. Additional common law claims pursuant to New York law

■ Finally, Norcom asserts separate common law claims of unfair competition, conspiracy, and breach of contract pursuant to New York law. Norcom rightly concedes that the arbitration clause encompasses the breach of contract claim. With respect to the unfair competition and conspiracy claims, Norcom alleges essentially that CIM has attempted to destroy Norcom's business by means of such acts as interference with Norcom's dealer and customer base, misuse of Norcom's trademarks, and misappropriation of Norcom's goodwill. *See* Compl. ¶¶ 82, 90. As such, these latter two claims also touch upon matters covered by the Distributor Agreement. *See Genesco,* 815 F.2d at 855 (unfair competition claim); *Altshul Stern & Co.,* 385 F.2d at 159 (conspiracy claim);

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 420, 426 (S.D.N.Y.1998) (misappropriation of goodwill acquired during operation of contract "touches upon" matters covered by contract). Therefore, all three common law claims are subject to the arbitration clause in the Distributor Agreement.

### 5. Conclusion

The arbitration clause in Article 22.7 of the Distributor Agreement encompasses all of Norcom's claims against CIM except for the allegation that CIM improperly solicited Norcom employees.

### C. Arbitrability of federal statutory claims

■ Third, this Court must inquire whether Congress intended that Norcom's federal statutory claims be nonarbitrable. Because federal statutory claims are presumed to be arbitrable, and because Norcom has made no showing in rebuttal of that presumption, Norcom's Lanham Act claims are therefore assumed to be arbitrable. *See Gidatex, S.r.L.,* 13 F.Supp.2d at 427 n. 2 (citing *Oldroyd,* 134 F.3d at 77–78). Moreover, "pendent state law claims are also arbitrable." *Ainbinder v. Wall Street Clearing Co.,* No. 92 Civ. 7315, 1993 WL 106408, at *4 (S.D.N.Y. Apr. 7, 1993) (citing *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985)).

### D. Stay

■ Pursuant to the FAA, if a matter is arbitrable, a stay of the litigation is entered pending completion of the arbitration. *See* 9 U.S.C. § 3. In addition, issues not subject to arbitration may be stayed "pursuant to 'the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 76 (2d Cir.1997) (quoting *Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d

Cir.1964)). "Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856 (citing *NPS Communications, Inc. v. Continental Group, Inc.*, 760 F.2d 463, 465 (2d Cir.1985)).

Here, the only allegation not subject to arbitration is the allegation that CIM improperly solicited Norcom employees. CIM disputes that allegation. *See* Decl. of Alberto Mucelli ¶ 17. Accordingly, a stay of this litigation is appropriate pending the completion of arbitration proceedings. *See Fleck v. E.F. Hutton Group, Inc.*, 891 F.2d 1047, 1053 (2d Cir.1989).

## II. Norcom's motion for a preliminary injunction

Norcom has cross-moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65. Specifically, the requested relief would require CIM to comply with provisions of the Distributor Agreement that, Norcom contends, require CIM to supply Norcom with (1) spare parts for embossing machines generally distributed by Norcom; and (2) embossing machines and spare parts sold and distributed by Norcom to the General Services Administration (the "GSA") pursuant to a separate contract with the U.S. Government.

 It is well settled that "[t]he fact that a dispute is to be arbitrated ... does not absolve the court of its obligation to consider the merits of a requested preliminary injunction." *Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir.1984) (per curiam) (citing *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir.1972)); *accord Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1052 (2d Cir.1990). In general, a party seeking a preliminary injunction must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam) (citing *Caulfield v. Board of Educ.*, 583 F.2d 605, 610 (2d Cir.1978)); *accord Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

### A. Prohibitory or mandatory nature of the relief requested

 A preliminary injunction is "prohibitory" if it bars conduct that would alter the status quo before a court or arbitrator has an opportunity to resolve the merits of the action. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995) (citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985)). By contrast, a "mandatory" injunction "command[s] some positive act." *Id.* In the latter case, a heightened burden of proof attaches, and the injunction may issue " 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.' " *Id.* (quoting *Abdul Wali*, 754 F.2d at 1025); *accord Koppell v. New York State Bd. of Elections*, 8 F.Supp.2d 382, 384 (S.D.N.Y.), *aff'd*, 153 F.3d 95 (2d Cir.1998) (per curiam).

The injunctive relief sought by Norcom is mandatory rather than prohibitory: it would require CIM to undertake positive action by selling machines and parts to Norcom. *See New Pacific Overseas Group (USA), Inc. v. Excal Int'l Dev. Corp.*, No. 99 Civ. 2436, 1999 WL 285493, at *4 (S.D.N.Y. May 6, 1999).

### B. Merits

On the merits of its contract claims, Norcom first contends that CIM's failure to supply it with spare parts and supplies violates Article 13.1 of the Distributor Agreement, which states, "CIM agrees to provide Spare Parts and Supplies to [Nor-

com] for a period of at least five (5) years following the last sale of any model sold to [Norcom] under this Agreement." Aff. of Hansen Ex. B at 11, ¶ 13.1. In response, CIM does not contest that it has failed to provide these parts and supplies but argues instead that "[t]he only reason CIM Italy has refused to deliver certain spare parts to plaintiff is that plaintiff has failed to pay for such goods in advance, contrary to CIM Italy'[s] well-established procedure." Decl. of Mucelli ¶ 10.

However CIM may view its procedures, this Court must limit its focus to the language of the Agreement, since " '[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.' " *Tom Doherty Assocs., Inc.*, 60 F.3d at 35–36 (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990)). Because the Agreement expressly states that payment may be made within sixty days after the date of shipment, and nowhere mandates that payment must be made in advance of shipment, *see* Aff. of Hansen Ex. B at 7, ¶ 5.3, CIM's contrary argument must be rejected. This Court therefore concludes that Norcom has made a clear showing of likelihood of success on this first issue, as required by the heightened standard applicable to mandatory injunctions.

Second, Norcom asserts that CIM has breached the Distributor Agreement by failing to provide embossing machines and spare parts for sale and distribution by Norcom to the GSA pursuant to a separate contract with the U.S. Government. Norcom relies on Article 3.4.2 of the Distributor Agreement, which states that, regardless of termination of the Agreement, "CIM will supply the PRODUCTS sold by [Norcom] under the G.S.A. U.S. Government Contract until the date of expiration of the said contract (June 1999)." Aff. of Hansen Ex. B at 4, ¶ 3.4.2. In response, CIM points out that the quot-

ed passage only obligated it to provide such products through June 1999. Norcom rejects this, however, in light of the fact that the U.S. government extended the expiration date until June 30, 2004, and later modified that date to June 30, 2001, pursuant to an option in its separate contract with Norcom. *See* Reply Aff. of W. Bruce Hansen ¶ 10.

In other words, Norcom contends that Article 3.4.2. hinges on the words "until the date of expiration" and therefore requires CIM to provide parts until the renewed date of expiration, that is, June 30, 2001. However, Norcom's reading of Article 3.4.2, unlike the interpretation advanced by CIM, would treat the words "June 1999" as mere surplusage, and any interpretation that would render any portion of the contract language a nullity should be avoided. *See Namad v. Salomon Inc.*, 74 N.Y.2d 751, 753, 543 N.E.2d 722, 723, 545 N.Y.S.2d 79, 80 (1989). This Court therefore does not accept Norcom's reading of Article 3.4.2 of the Distributor Agreement on the state of the record as of this motion.

In the alternative, Norcom argues it entered into a renewal contract with the U.S. government only in reliance on independent representations from CIM that CIM would continue to provide the needed products through the renewed expiration date of June 30, 2001. Here, Norcom proffers a letter from CIM dated March 30, 1995, certifying that CIM would provide such products "for the contract period." *See* Reply Aff. of Hansen Ex. C. Aside from the ambiguity of the quoted language, this letter predates the Distributor Agreement by nearly two years, *see* Aff. of Hansen ¶ 5, and is nowhere incorporated by reference in the Distributor Agreement. Accordingly, the letter provides no basis for ignoring the express language of the Agreement itself.

Similarly, Norcom also proffers two letters sent by Norcom to CIM memorializing conversations in which CIM purportedly agreed to provide products for the

GSA on an extended basis. *See* Reply Aff. of Hansen Ex. D. However, the second of these letters, signed by Norcom President W. Bruce Hansen on September 23, 1999, proposes that Norcom give the GSA ninety days' notice of the removal of CIM products from the GSA Schedule and that CIM provide products only for orders received before that deadline. *See id.* Consequently, these letters undercut the argument that Norcom understood CIM to undertake a legally binding obligation to continue to provide products through June 30, 2001.

With respect to this second issue, this Court therefore concludes that Norcom has failed to demonstrate sufficiently serious questions going to the merits to make them a fair ground for litigation, as required by the usual standard applicable to prohibitory injunctions.

C. Irreparable harm

■ A showing of irreparable harm is "the most important prerequisite for the issuance of a preliminary injunction." *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995) (citing *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990)); *accord Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999) (per curiam). "A moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages.'" *NAACP,* 70 F.3d at 224 (citing *Reuters Ltd.,* 903 F.2d at 907). Accordingly, although the loss of an ongoing business, a relatively unique product, or significant good will may give rise to irreparable harm, the loss of only a part of a business will not support injunctive relief if the loss is entirely compensable in monetary damages. *See generally Tom Doherty Assocs., Inc.,* 60 F.3d at 37–38 (collecting cases); *New Pacific Overseas Group (USA), Inc.,* 1999 WL 285493, at *6 (same).

■ Norcom contends that in the absence of injunctive relief, it will suffer "ir-reparable and irreversible harm to its business reputation and good will, including the wholesale exodus of its dealer and customer base to other suppliers." Aff. of Hansen ¶ 18. However, to the extent Norcom seeks specific performance with respect to orders for CIM products on behalf of the GSA, any contention of irreparable harm on this score is negated by the September 23, 1999 letter from W. Bruce Hansen to CIM, referred to above, in which Hansen proposed removing CIM products from the GSA schedule. *See* Reply Aff. of Hansen Ex. D. Simply put, Norcom has given no explanation why injunctive relief is now necessary to preserve a portion of its business that Norcom proposed to sacrifice in September 1999 in order to ease its business relations. This Court therefore concludes that Norcom has failed to demonstrate that irreparable harm would result from the loss of its business with GSA in products manufactured by CIM, in the absence of a preliminary injunction.

As noted earlier, Norcom also seeks specific performance with respect to orders for spare parts for embossing machines generally distributed by Norcom. Here, Norcom presents letters from dealers and customers complaining about delayed orders and, in some cases, threatening to terminate business relations with Norcom. *See* Aff. of Hansen ¶ 19, Ex. D–G. In explaining the import of this lost good will, Hansen has stated that sales of embossing products accounted for approximately 80% of Norcom's total revenue for the fiscal year ending August 31, 1999, *see* Reply Aff. of Hansen ¶ 20, and that "most of Norcom's total revenue" is generated from the sales to customers represented by the those letters of complaint, *see id.* ¶ 20. Although CIM has suggested that Norcom sold a portion of its business in 1999, *see id.* ¶¶ 13–15, CIM has presented no evidence to contradict these figures. In short, Norcom contends that its inability to supply a relatively unique product—spare parts for machines manufactured by CIM—will cause those customers responsi-

ble for most of its revenues to abandon Norcom entirely in favor of its competitors, in the absence of an injunction.

As the Second Circuit has explained, "in cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product." *Reuters Ltd.*, 903 F.2d at 909. More recently, that court has reformulated that in the following "governing principle":

> Where the availability of a product is essential to the life of the business or increases business of the plaintiff beyond sales of that product-for example, by attracting customers who make purchases of other goods while buying the product in question-the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate.

*Tom Doherty Assocs., Inc.*, 60 F.3d at 38.

The present case falls well within the ambit of these precedents. There is no dispute that the product CIM supplies to Norcom is relatively unique, in the sense that CIM is the sole source of spare parts for embossing machines manufactured by CIM. Moreover, the same customers who insist upon receiving this product are essential to the life of Norcom's business, and the evidence attests to the willingness of these customers to abandon Norcom in the event that Norcom can no longer supply this product. Finally, although Norcom's evidence consists primarily of the testimony of its own executive and of complaints from selected customers, this is precisely the sort of evidence upon which the Second Circuit has relied in reversing the denial of a preliminary injunction under similar facts. *See Reuters Ltd.*, 903 F.2d at 908-09. This Court therefore concludes that Norcom has demonstrated that

irreparable harm would result from the loss of its business in spare parts for embossing machines manufactured by CIM.

### D. Laches

■ CIM contends that a finding of irreparable harm is inappropriate in any event because the severity of the harm is obviated by Norcom's delay in not moving for mandatory relief in June 1999, when the breaches of contract allegedly began to occur. *See* Compl. ¶ 110. Delay by the moving party, however, weighs decisively against a finding of irreparable harm only if either (a) the delay indicates that the moving party was aware of its rights but concluded those rights were not violated, or (b) the nonmoving party took costly steps during the period of delay that would be undone by injunctive relief. *See Tom Doherty Assocs., Inc.*, 60 F.3d at 39-40. As noted above, the letter from Hansen to CIM in September 1999, proposing to remove CIM products from the GSA schedule, suggests Norcom did not believe its rights were violated in this respect. *See* Reply Aff. of Hansen Ex. D. Otherwise, however, the repeated communications made by Norcom to CIM starting in May 1999, *see* Compl. ¶ 28, as well as the filing of its complaint in October 1999, indicate that Norcom did conclude at those earlier dates that its rights were in fact violated. Moreover, CIM has presented no evidence of costly steps on its part that would be undone by the relief requested by Norcom. Hence, this Court finds that the doctrine of laches weighs against a finding of irreparable harm with respect to orders on behalf of the GSA, but that this doctrine is otherwise irrelevant to the disposition of the present motion.

### E. Conclusion

In sum, this Court concludes that Norcom has demonstrated a clear likelihood of success on the merits and irreparable harm with respect to the provision of spare parts by CIM, and that Norcom has failed to demonstrate either fair grounds for liti-

gation or irreparable harm with respect to the provision of products by CIM for sale or distribution to the GSA.

## CONCLUSION

Accordingly, for the reasons set forth above, CIM's motion to compel arbitration should be granted, except to the extent that Norcom alleges improper solicitation of its employees. CIM's motion to stay this action pending arbitration should be granted in full. Norcom's motion for a preliminary injunction should be granted, but only to the extent that Norcom seeks specific performance of CIM's obligation to provide spare parts pursuant to Article 13.1 of the Distributor Agreement.