**In re HAGERSTOWN FIBER LIMITED PARTNERSHIP, Debtor.**

**David R. Kittay, Trustee For Hagerstown Fiber Limited: Partnership, Plaintiff,**

**v.**

**Carl C. Landegger, Pencor First Fiber, Inc., SBCCS Constructors Joint Venture, The Black Clawson Company, Black Clawson Partner, Inc., Simons Engineering, Inc., AMEC E & C Services, Inc., Sea Crest Industries, Inc., Sea Crest Construction Corporation, Peter Scalamandre & Sons, Inc., Peter Bailey, Michael Bach, Joel Feldman, Morrison Cohen Singer & Weinstein, LLP, Robert Strasburg, Landegger Paper Recycling Mill Trust, R.W. Beck & Co., Michael Macaulay, Fidelity & Deposit Company of Maryland, St. Paul Fire and Marine Insurance Company, Seaboard Surety Company, and National Fire Insurance Company of Hartford, Defendants.**

**Bankruptcy No. 99 B 43051(SMB).
Adversary No. 01–2958(SMB).**

United States Bankruptcy Court,
S.D. New York.

April 26, 2002.

David R. Kittay, Judith L. Siegel, Kittay, Gold & Gershfeld, P.C., Attorneys for Chapter 7 Trustee, White Plains, NY, of Counsel.

Irwin J. Sugarman, Jeffrey S. Sabin, Alan R. Glickman, Sung–Hee Suh, Schulte, Roth & Zabel, LLP, Special Litigation Counsel to Chapter 7 Trustee, New York City, of Counsel.

John M. Callagy, Steven P. Caley, Kevin C. Walker, Kelley, Drye & Warren, LLP, Attorneys for Carl C. Landegger, Pencor First Fiber, Inc., The Black Clawson Company, Black Clawson Partner, Inc., Michael Bach, Robert Strasburg and Landegger Paper Recycling Mill Trust, New York City, of Counsel.

Daniel A. Lowenthal, Pillsbury Winthrop, LLP, Co–Counsel to SBCCS Constructors Joint Venture, New York City, of Counsel.

Michael Schatzow, Venable, Baejter & Howard, LLP, Co–Counsel to SBCCS Constructors Joint Venture, Baltimore, MD, of Counsel.

Alan J. Lipkin, Willkie, Farr and Gallagher, Attorneys for the Unofficial Bondholders' Committee, New York City, of Counsel.

James A. Pardo, Jr., Jeannie R. Rubin, Mark M. Maloney, King & Spalding, Attorneys for Simons Engineering, Inc., AMEC E & C Services, Inc. and Peter Bailey, Atlanta, GA, of Counsel.

Office of the United States Trustee, Patricia H. Schrage, New York City, of Counsel.

John Simoni, Goetz, Fitzpatrick, Most & Bruckman, LLP, Attorneys for Sea Crest Industries, Inc., Sea Crest Construction Corporation, Peter Scalamandre & Sons, Inc., St. Paul Fire and Marine Insurance Company, and Seaboard Surety Company, New York City, of Counsel.

Gerald A. Novack, John Sullivan, Mahtab Foroughi, Kirkpatrick & Lockhart, LLP, Attorneys for Joel Feldman and Morrison, Cohen, Singer & Weinstein, LLP, New York City, of Counsel.

Darren F. Farrington, Mark G. Ledwin, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Attorneys for R.W. Beck & Co. and Michael Macaulay, White Plains, NY, of Counsel.

Irving H. Picard, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Co–Counsel to Fidelity & Deposit Company of Maryland and National Fire Insurance Company of Hartford, New York City, of Counsel.

Steven K. Davidson, Steptoe & Johnson, LLP, Co–Counsel to Fidelity & Deposit Company of Maryland and National Fire Insurance Company of Hartford, Washington, DC, of Counsel.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTIONS FOR ORDERS COMPELLING ARBITRATION AND FOR STAY OF ADVERSARY PROCEEDING PENDING ITS COMPLETION AND GRANTING STAY RELIEF TO PROSECUTE ARBITRATION

STUART M. BERNSTEIN, Chief Judge.

The chapter 7 trustee of Hagerstown Fiber Limited Partnership commenced this adversary proceeding to assert the estate's claims against multiple parties arising in connection with the construction and operation of a waste paper treatment

facility (the "Mill," "Project," "Plant" or "Facility"). SBCCS Constructors Joint Venture ("SBCCS"), the defendant that built the Plant, has moved to stay the adversary proceeding and compel arbitration pursuant to the arbitration clause contained in the construction contract between the SBCCS and the debtor. Substantially all of the other defendants have either joined in that stay motion, or moved separately for the same relief.

The trustee's Objection to Claims, Counterclaims and Complaint, dated July 20, 2001 (the "Complaint") charges, in the main, that SBCCS failed to build and turn over a Plant that met the requirements of the parties' contract. Instead, using fraud and other improper means, SBCCS manipulated the criteria for judging its performance, concealed its breaches and duped the debtor into accepting a substandard Project. These claims are arbitrable, and will be stayed. Similarly, the stay will extend to the claims against the other defendants who allegedly participated or assisted SBCCS.

The Complaint further charges that during the 91 day period following Commercial Operation (defined below), when SBCCS was contractually liable for operating losses, SBCCS and other defendants entered into secret agreements to maximize the cash receipts and minimize the payment of expenses. These actions created a false illusion of profitability, and harmed the debtor. Since these claims concern the extent of SBCCS's contractual liability for operating shortfalls, they are also arbitrable. SBCCS is entitled to a mirror image stay of the adversary proceeding, and once again, the stay extends to the other defendants who are alleged to have participated in this scheme.

Finally, the Complaint maintains that the defendants other than SBCCS improperly operated the Mill for the approximate six months after Commercial Operation, and committed other wrongful acts unrelated to SBCCS's performance or the question of the parties' rights and obligations under the construction contract. These claims are not subject to arbitration, and will not be stayed.

## BACKGROUND [1]

The debtor, a Maryland limited partnership, was formed to acquire, construct, own and operate the Mill. (*See* Complaint ¶ 22.) Its affairs were conducted pursuant to an Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement") executed as of September 30, 1994. The debtor's sole general partner was the defendant, Pencor First Fiber, Inc. ("PFF"), a wholly-owned subsidiary of the defendant, The Black Clawson Company ("Black Clawson").[2] PFF owned a one percent partnership interest. The limited partners included Black Clawson (32.33% partnership interest), SBCCS (5% partnership interest) and the Class C Limited Partners (collectively, a 61.67% partnership interest). (*Id.* ¶¶ 79–80.)

The principal force behind the debtor and the Mill was the defendant, Carl C. Landegger, a well-known figure in the paper industry. (*See id.* ¶ 3.) He was the Chairman of the Board and the controlling shareholder of Black Clawson, (*id.* ¶ 25), and hence PFF, and held interests in sev-

---

1. The "Background" discussion is based primarily upon the allegations in the trustee's Objections to Claims, Counterclaims and Complaint, dated July 20, 2001 (the "Complaint") and certain documents submitted by the parties. It does not reflect any factual findings.

2. The effort to remove PFF as sole general partner is discussed in *In re Hagerstown Fiber Ltd. Partnership*, No. 98 B 41988, 1998 WL 538607 (Bankr.S.D.N.Y. Aug. 24, 1998).

eral other entities, described below, that figured in the operations of the Mill. (*See id.* ¶ 24.) His holdings also gave him an indirect interest in SBCCS.[3]

Under § 4.01 of the Partnership Agreement, PFF was given broad authority to manage the debtor's affairs, with certain exceptions involving either "Major Decisions" or matters involving the debtor and various PFF affiliates. (*Id.* ¶¶ 81–83.) Major Decisions required the approval of the majority-in-interest of the non-PFF affiliated limited partners.[4] (*Id.* ¶ 82.) In addition, several agreements, most notably the construction contract discussed immediately below and the operation and maintenance contract considered elsewhere, completely removed PFF from the decision making process regarding dealings between the debtor, on the one hand, and SBCCS or 1st Urban Fiber Operations ("FUFO"), the Mill operator and Landegger affiliate, on the other. In those cases, the decisions would be made by an agent of the non-affiliated limited partners, referred to either as the Limited Partners' Agent or the Owner's Representative. (*Id.* ¶ 85.)

## A. The Relevant Agreements

On September 30, 1994, the debtor and SBCCS entered into an Amended and Restated Design, Engineering, Procurement and Construction Agreement (the "EPC Agreement"), the principal contract docu-

ment in the case.[5] SBCCS agreed to construct a waste paper pulping and deinking facility and waste water treatment plant in Hagerstown, Maryland. In exchange, the debtor agreed to pay SBCCS $131 million. (*See id.* ¶ 3.)

The EPC Agreement measured the progress of the Plant's construction by a number of milestones. The two most significant were "Mechanical Completion" and "Commercial Operation." Pursuant to § 5.1 of the EPC Agreement, the Plant achieved "Mechanical Completion" when, among other things: (a) all materials and equipment were installed substantially in accordance with the facility design, and (b) SBCCS and the debtor agreed on a "Preliminary Punch List" of uncompleted items. When SBCCS met these requirements, it could deliver a certificate to the debtor certifying Mechanical Completion. The Independent Engineer, defendant R.H. Beck & Co. ("Beck"), could then approve or object to the certificate. (*Id.* ¶¶ 6, 69.)

Achieving Mechanical Completion carried significant financial consequences under the EPC Agreement. During the period between Mechanical Completion and Commercial Operation (known as the "Ramp–Up Period"), SBCCS operated the Mill for testing purposes at its own expense, and earned a Ramp–Up Fee of approximately $3.56 million plus any profits realized from the sale of pulp produced

---

**3.** SBCCS is a joint venture. "SBCCS Partners" are the joint venturers, each owning 25%. (Complaint ¶ 3.) They include three construction firms, Simons Engineering, Inc. ("Simons Engineering"), Commonwealth Construction Co. ("Commonwealth"), and Sea Crest Industries, Inc. ("Sea Crest"), and Black Clawson Partner, Inc. ("BC Partner"), (*id.* ¶ 37), an entity controlled by Landegger ("Landegger"). (*Id.* ¶ 26.) In addition to being a member of SBCSS (through BC Partner), Landegger, through Black Clawson, supplied much of the equipment that was utilized

in the construction and operation of the Plant, and became the putative operator of the Plant after Commercial Operation. (*Id.* ¶ 8.)

**4.** For the purposes of this calculation, SBCCS was not considered a PFF affiliate. (Complaint ¶ 82.)

**5.** The EPC Agreement is attached as Exhibit 1 to SBCCS's *Motion to Stay Adversary Proceeding as to SBCCS and to Compel Arbitration,* dated Aug. 10, 2001.

during the Ramp–Up Period. (*Id.* ¶ 70.) More importantly, Mechanical Completion capped SBCCS's liability at approximately $40 million plus certain liquidated damages; before Mechanical Completion, SBCCS's potential contractual liability was unlimited. (*Id.* ¶ 71.)

The second, pivotal landmark event was Commercial Operation, which SBCCS had to achieve by October 30, 1996. (*See id.* ¶ 75.) To do so, it had to satisfy two chief conditions. First, SBCCS had to complete construction, except for those items listed on a Punch List prepared by SBCCS and delivered to the debtor.[6] The cost of completing the listed items had to be less than $1 million, and SBCCS was obligated to post a bond in an amount equal to 150% of those costs. (*Id.* ¶ 72.) Second, the Plant had to pass two separate "Performance Tests." During the "Seven Day Test," carried out over a period of 168 hours, the Plant had to operate under specified conditions, and produce a designated amount of pulp that met the contract's requirements. The other test ran for 24 hours, and also required the production of a specific quantity and quality of pulp. The Plant passed the tests only after SBCCS delivered a "Performance Test Report" to the Independent Engineer (Beck), and Beck certified that SBCCS satisfied all the criteria for "Test Passage." (*Id.* ¶ 73.)

If the Plant did not achieve Commercial Operation by October 30, 1996, SBCCS was obligated to complete the Plant and bring it to Commercial Operation at its own expense. In addition, it became liable for interest and other related costs (from October 30, 1996 until Commercial Operation) on the $159 million in bonds sold to finance the Project as well as other payments relating to the failure to pass the Performance Tests. Lastly, SBCCS's default triggered the liability of the several defendants (the "Sureties") that had issued the performance bond guarantying the performance of SBCCS's contractual obligations. (*Id.* ¶ 5.)

Achieving Commercial Operation, on the other hand, produced economic benefits for SBCCS. It became entitled to the last of a series of "Milestone Payments," bringing its total contract consideration to $131,210,000.00. In addition, it permitted SBCCS, subject to completion of the Punch List items and any warranty claims, to tender the Plant to the debtor, and turn the operation of the Plant over to the Landegger affiliate, FUFO. (*See id.* ¶¶ 7, 74.) FUFO and the debtor were parties to an Operation & Maintenance Agreement ("O & M Agreement") pursuant to which FUFO would operate the Plant for 20 years. (*Id.* ¶¶ 16(c), 89.) If FUFO did not run the Plant profitably during the first ninety-one days following Commercial Operation, SBCCS was obligated to pay liquidated damages to the debtor.

Lastly, the EPC Agreement included an arbitration clause. It covered any "dispute or matter in controversy [that] arises between the Owner and the Contractor under this Agreement." (EPC Agreement § 13.1(b).)

## B. The Construction of the Mill

Construction of the Plant began in 1994. As it proceeded in 1995 and early 1996,

---

**6.** Although sometimes confusing, this case involves two different punch lists. Under § 5.1 of the EPC Agreement, the parties had to reach mutual agreement on a Preliminary Punch List as a condition to Mechanical Completion. Under § 6.1, the Plant could not realize Commercial Operation unless, among other requirements, SBCCS delivered a separate Punch List detailing items which, in the aggregate, cost less than $1 million to complete. In addition, SBCCS had to procure a bond in the amount of 150% of the projected completion costs. Presumably, the Preliminary Punch List was the starting point for the preparation of the subsequent Punch List.

three problems became apparent. First, SBCCS had underestimated the cost and time to complete the Plant. In fact, it could not complete it in accordance with project specifications, either on time or within the contract amount. Second, it was doubtful that the machinery manufactured by Black Clawson, at least as configured at the Plant, could ever produce pulp in sufficient quantities and of high enough quality for the Plant to operate profitably. Third, the market price for the finished product, deinked market pulp, was in a downward spiral, making it improbable that the Plant would operate at a profit in the immediate future. (Complaint ¶¶ 9–10, 101–03.)

According to the trustee, once it became clear that SBCCS could not make a profit and faced significant liabilities based upon the inevitable inability to achieve Commercial Operation by October 30, 1996, SBCCS and Landegger embarked on a course of conduct to conceal their failure and inability to meet the contractual obligations. In substance, they, other Landegger affiliates and third parties committed, or aided and abetted the commission of, multiple breaches of the EPC Agreement, fraud, breach of fiduciary duty, fraudulent transfers and other wrongdoing, all designed to create the illusion that Mechanical Completion and Commercial Operation had been achieved when, in fact, they had not. (*Id.* ¶¶ 11–12.)

### 1. The Failure to Achieve Mechanical Completion

Mechanical Completion required, *inter alia*, that the debtor and SBCCS agree on a Preliminary Punch List. The trustee claims that SBCCS and Landegger fraudulently induced the debtor, who was acting through the Owner's Representative, Pencor, Inc., to agree to the Preliminary Punch List by concealing a secret side-agreement under which Landegger purportedly released SBCCS from the obligation to complete some of the required work. (*Id.* ¶¶ 13(a), 211–22.)

Agreeing on the Preliminary Punch List was only one step. As noted, Beck, the so-called "independent" engineer, also had to certify the Mechanical Completion certificate tendered by SBCCS. The trustee contends that Landegger corrupted Beck by entering into a secret amendment to the Independent Engineer Agreement between the debtor and Beck. The amendment capped Beck's liability at $400,000.00, as opposed to the unlimited liability that existed under the amended agreement. (*Id.* ¶ 142.) As a result, the corrupted Beck certified Mechanical Completion, even though the Plant failed to meet many of the contractual requirements for Mechanical Completion. (*See id.* ¶¶ 223–28.)

### 2. The Failure to Achieve Commercial Operation

#### a. The Seven Day Test

The trustee's allegations regarding Commercial Operation relate primarily to the manipulation of the Performance Tests procedures and results. The "Seven Day Test" dictated that the Plant operate continuously for 168 hours, and produce a specified quantity and quality of pulp during that period. (*See id.* ¶ 108.) Moreover, Commercial Operation had to be achieved by October 30, 1996. After several aborted attempts, (*see id.* ¶¶ 110–13), SBCCS commenced the "last chance" test on October 18, 1996. (*Id.* ¶ 114).

The test proceeded without incident for six days. In anticipation of opening ceremonies, a worker washed down the roof of the Mill's control room. This caused water to leak into a control panel resulting in a short circuit that shut the Mill down for twelve hours on October 23, 1996. (*Id.* ¶ 117.) Unless the shutdown could be

characterized as an Uncontrollable Circumstance, or "UC" (essentially, an "Act of God") under the EPC Agreement, SBCCS had to give a two day notice before restarting the Seven Day Test. With the October 30, 1996 deadline looming only seven days away, SBCCS could not give the required notice and still have enough time to run another Seven Day Test. (*See id.* ¶ 118.) Deliberately withholding the true information from the Owner's Representative, SBCCS falsely represented that the shutdown was a "force majeure"—implying that it was a "UC"—and that the test had been passed. (*Id.* ¶¶ 13(b)(i), 118, 160, 170.)

SBCCS also failed the quantity and quality components of the Seven Day Test. It improperly substituted higher grade raw materials that produced cleaner and brighter pulp. (*Id.* ¶¶ 120–24.) In addition, it failed to use the proper formula for converting the moisture-laden pulp output to the "bone dry" output required under the EPC Agreement. Had SBCCS used the correct conversion number, the output would have fallen short of the test requirements by 20 tons, and required SBCCS to make a contractual penalty payment of over $1 million. (*Id.* ¶¶ 125–28.)

Notwithstanding the foregoing, SBCCS still could not have "passed" the Seven Day Test without the corrupted Beck. Here, the trustee makes two charges. First, Beck improperly altered the test procedures, making the test easier to pass. (*See id.* ¶¶ 151–58.) Second, Beck falsely certified that the Seven Day Test had been passed—although he knew otherwise—acquiescing in SBCCS's and Landegger's contention that the interruption of the continuous operation test was due to an Uncontrollable Circumstance. (*Id.* ¶¶ 159–60, 171.)

### b. Other Deficiencies

SBCCS did not achieve Commercial Operation for other reasons as well. For example, the cost of the unfinished items on the Punch List could not exceed $1 million, and SBCCS had to bond the unfinished work in amount equal to 150% of the cost. (*Id.* ¶ 131.) An accurate Punch List would not have met these requirements. (*See id.* ¶ 132.) In addition, SBCCS did not meet the contractual requirements relating to outstanding Events of Default, (*id.* ¶ 133), the delivery of documentation, (*id.* ¶ 134), or the amount of inventories. (*Id.* ¶ 135.)

### c. The Commercial Operation Settlement

Despite the apparent satisfaction of the Seven Day Test, the Owner's Representative contended that Commercial Operation had not been achieved. A significant amount of work remained undone, especially with regard to the Waste Water Treatment Facility. (*Id.* ¶ 163.) Landegger misrepresented the extent of the Plant's problems and the repair costs to the Owner's Representative, (*id.* ¶ 174), and proposed a global settlement of all outstanding issues between the debtor and SBCCS other than the warranty and Punch List claims. He convinced the Owner's Representative that the Plant required only $1.6 million in repairs, and that once those repairs were made, the debtor would have a fully functional Mill. (*Id.* ¶ 176.)

As a result of this representation, (*see id.* ¶ 178), and the misrepresentations regarding the reason for the shutdown, the improper use of higher grade raw material and the deficient tonnage, the Owner's Representative signed the Commercial Operation Settlement. (*Id.* ¶ 173.) This paved the way for the turn over of a defective Plant to the debtor. In so doing,

the debtor gave up its right to a Plant that had passed performance tests, certain "Buydown Payments" in excess of $8.7 million and the protection of $39.6 million in contractual liability of SBCCS. (*Id.* ¶ 331.)

### C. Post–Commercial Operation and the Secret Cash Management Agreement

While the trustee argues that the Plant never achieved Commercial Operation, he also asserts independent claims based upon post-Commercial Operation events. Once the Mill achieved Commercial Operation, FUFO took over its operation. During the ninety-one day period following Commercial Operation, SBCCS remained liable for liquidated damages in the amount of (1) the debt service on the bonds, and (2) any monthly shortfall between pulp sales revenues and production expenses, calculated on a cash basis. (*Id.* ¶¶ 181–82.) Speeding collections and delaying payments during this period limited or eliminated SBCCS's contractual liability for post-Commercial Operation monthly shortfalls.

The trustee charges that FUFO and another Landegger affiliate, 1st Urban Fiber Sales, Inc. ("FUFSI"), entered into a secret agreement with SBCCS ceding it a substantial amount of control over the debtor's cash during this critical period. (*Id.* ¶ 183.) Termed the Cash Management Agreement, it granted SBCCS the right to be consulted on a variety of cash management issues, including the review of invoices before the submission to the debtor and the use of brokers and agents to speed payment from the purchasers of pulp produced by the Plant. Moreover, it gave SBCCS the right, under certain circumstances, to insist on affirmative steps to speed the collection of revenues and slow the payment of bills. (*Id.* ¶¶ 183–84.)

Landegger had projected (prior to the Cash Management Agreement) that the shortfall during the ninety-one day period would exceed $12 million. Following the Cash Management Agreement, pulp was sold at substantial discounts to generate cash,[7] bills were deferred, and repairs were delayed, all causing damage to the debtor, and substantially reducing the shortfall below the projected amount. (*Id.* ¶¶ 187, 230–40, 248–51.)

### 1. Secret MIS Side Agreement

The Mill was designed to operate using two integrated computer systems: the DCS System monitored and controlled production, and the Management Information System ("MIS") stored production data and generated operating reports. (*Id.* ¶ 191.) Neither system worked properly, and numerous disputes arose. (*Id.* ¶ 192.)

By October 1996, a six page punch list still remained relating solely to the outstanding MIS work. (*Id.* ¶ 194.) Rather than make the repairs, SBCCS and Landegger, acting without authority, entered into another secret agreement—the MIS Side Agreement. It relieved SBCCS of any obligation to provide a working MIS in exchange for the payment of 640 hours of consultant's time—worth approximately $35,000.00—to repair the system. In fact, the repair estimates far exceeded the 640 hours. (*Id.* ¶¶ 195–97.)

### 2. Other Claims and Issues

#### a. Showcasing the Technology

Following Commercial Operation, SBCCS stepped out of the immediate pic-

---

7. The trustee also charges that after Commercial Operation, Landegger or his affiliates breached contractual and fiduciary duties to the debtor by selling SBCCS pulp, produced during the Ramp–Up Period instead of the debtor's pulp, produced post-Commercial Operation. (Complaint ¶¶ 241–47.)

ture, but Landegger and his affiliates continued to hurt the debtor. Black Clawson had been trying to sell its Shartle Division, the manufacturer of the Mill's deinking equipment. The trustee contends that Landegger and his affiliates ran the Plant after Commercial Operation to showcase the technology and equipment, despite the growing operating losses. As early as April 1996, Landegger had projected that the Mill would lose approximately $2.4 million per month on a "worst case" basis during the first year of Commercial Operation. In November 1996, Landegger predicted monthly losses of $1.9 million during the first six months. Landegger withheld the true operating information, and by the time that the Mill suspended operations on April 17, 1997, it had lost $27 million, or approximately $4.5 million per month. (*Id.* at ¶¶ 252–68.)

### b. Revenue Shortfall Waiver

Section 5.7 of the O & M Agreement required FUFO, the Mill operator, to make Revenue Shortfall Payments if the Mill fell short of monthly contractual target revenues. (*Id.* ¶ 275.) Landegger, however, continued to operate the Plant at a loss to showcase the deinking technology and equipment. To protect FUFO, Landegger fraudulently induced the Owner's Representative to execute the Revenue Shortfall Waiver, thereby relieving FUFO of the obligation to make the Revenue Shortfall Payments. (*Id.*) This saved FUFO $8.8 million, and passed those costs on to the debtor. (*Id.* ¶ 364.)

### c. United Container Agreement

Prior to May 1996, Jefferson Smurfit Corporation (U.S.) d/b/a Smurfit Recycling Company supplied the Mill's furnish (raw material) needs. (*Id.* ¶ 285.) Landegger informed the Owner's Representative that he had decided to purchase $3 million of furnish, hold it for the Mill's post-Commercial Operation needs, and sell the furnish to the debtor for his cost, plus freight, storage expenses, interest on the $3 million, and a fee of $7.50 per ton. (*Id.* ¶ 286.) The Owner's Representative objected, stating that Landegger could not supply furnish except at the lowest available price. (*Id.* ¶ 287.)

Despite the protest, and without further notice, Landegger caused the debtor to enter into the United Container Agreement with another of his affiliates. The agreement committed the debtor to buy furnish at an inflated price and independent of the actual fair market value. (*Id.* ¶¶ 287–88.) After Commercial Operation, the debtor purchased some or all of the $3 million of furnish. The debtor suffered damages of at least $1.3 million, the difference between the price paid for the furnish under the United Container Agreement and the price that it would have paid in an arms-length transaction. (*Id.* ¶ 289.)

### d. Amended Bulkley Dunton Agreement

At the time of the Project closing in 1994, the debtor was party to an agreement with Bulkley Dunton relating to the sale of its treated pulp. Under the Bulkley Dunton Agreement, the debtor could "put" its Specification Pulp (82 brightness pulp) to Bulkley Dunton at a sliding scale discount. Bulkley Dunton also had a right of first refusal to buy the non-Specification Pulp. The terms of the purchase of the non-Specification Pulp, including commissions, were left to future negotiation. (*Id.* ¶ 291.)

In November 1995, the debtor entered into a Pulp Sales Representation Agreement with Landegger affiliate FUFSI, to dispose of the pulp not sold to Bulkley Dunton. If FUFSI sold non-Specification Pulp to a different pulp purchaser, it

would receive a 5% commission. The Pulp Sales Representation Agreement preserved Bulkley Dunton's right of first refusal, and in the event Bulkley Dunton exercised its right, FUFSI would not earn its 5% commission. The Mill produced mostly non-Specification Pulp, and hence, the ability to sell it directly to Bulkley Dunton without paying FUFSI a commission was potentially valuable. (*Id.* ¶¶ 292–95.)

After Commercial Operation, Landegger caused the debtor to execute an Amended Bulkley Dunton Agreement. The latter modified the "put," increased the brightness level of the Specification Pulp, and eliminated Bulkley Dunton's right of first refusal. The net effect relieved Bulkley Dunton of the obligation to buy significant amounts of Specification Pulp from the debtor at a fixed discount from market, reduced the amount of Specification Pulp that could be tendered to Bulkley Dunton, and gave FUFSI the valuable right to market the non-Specification Pulp to third parties. (*Id.* ¶¶ 296–97.) As a result, the debtor paid substantial commissions to FUFSI instead of selling the pulp to Bulkley Dunton (with no commission to FUF-SI). (*Id.* ¶ 300.)

### D. The Prior Proceedings

Prior to the debtor's first bankruptcy case,[8] SBCCS filed an arbitration to resolve a dispute relating to its contractual right to payments. (*Declaration of Michael Schatzow, Esq.*, dated Aug. 8, 1991, at ¶ 7.) The debtor asserted nine counterclaims in the arbitration, and most appear to arise from the same transactions alleged in the Complaint. (*See id.* ¶ 8.) SBCCS filed a motion for summary judgment in the arbitration, but the matter was stayed, prior to a decision, by the first petition.

During the first case, SBCCS moved for relief from the stay to continue the arbitration. The Court denied the motion, and SBCCS filed a notice of appeal. The bankruptcy case was subsequently dismissed, the automatic stay terminated, and the pending appeal became moot.

### E. The Current Proceedings

On the heels of the dismissal of the first case, several creditors commenced this chapter 7 as an involuntary case in the District of Maryland. The case was eventually transferred to this Court, and following the entry of an order for relief, the United States Trustee appointed Mr. Kittay as the case trustee. He retained special counsel, and on or about July 20, 2001, the trustee filed his Complaint.

The Complaint contains 21 counts, summarized as follows:

| Count | Defendant(s) | Description of Claim |
|-------|-------------|----------------------|
| 1 & 2 | PFF, Landegger, SBCCS, SBCCS Parents [9] | Actual and constructive fraudulent conveyance under N.Y. Debtor and Creditor Law and 11 U.S.C. § 544(b) relating to the execution of the Preliminary Punch List and related agreements. |

**8.** The events leading up to the first chapter 11 filing in March 1998, and its eventual dismissal in December 1998, are chronicled in *In re Hagerstown Fiber Ltd. Partnership*, No. 98 B 41988, 1998 WL 538607 (Bankr.S.D.N.Y. Aug. 24, 1998) and *In re Hagerstown Fiber Ltd. Partnership*, 226 B.R. 353 (Bankr. S.D.N.Y.1998).

**9.** The "SBCCS Parents" include the defendants Black Clawson Partner, Inc., Simons International Corp., Sea Crest Construction Corp. & Peter Scalamandre & Sons, Inc. (Complaint ¶ 41.)

| 3 & 4 | PFF, Landegger, SBCCS and SBCCS Parents | Actual and constructive fraudulent conveyance under N.Y. Debtor and Creditor Law and 11 U.S.C. § 544(b) relating to execution of the Commercial Operation Settlement |
|---|---|---|
| 5 | Beck | Actual fraudulent conveyance under N.Y. Debtor and Creditor Law and 11 U.S.C. § 544(b) relating to the execution of the Amended Independent Engineer Agreement. |
| 6 & 7 | SBCCS and SBCCS Parents | Actual and constructive fraudulent conveyance under N.Y. Debtor and Creditor Law and 11 U.S.C. § 544(b) consisting, in substance, of transfers of the debtor's cash in accordance with the terms the Cash Management Agreement |
| 8 & 9 | PFF and Landegger | Actual and constructive fraudulent conveyance under New York law and 11 U.S.C. § 544(b) consisting, in substance, of the waiver of the right to collect revenue shortfall payments from FUFO in excess of $8.8 million by virtue of the Revenue Shortfall Waiver. |
| 10 | SBCCS, Black Clawson, PFF and Landegger | Turnover pursuant to 11 U.S.C. § 542(a) of various Plant drawings, spare parts, equipment and books and records related to the Plant. |
| 11 | SBCCS and SBCCS Parents | Breach of the EPC Agreement based upon the failure to achieve Mechanical Completion. |
| 12 | SBCCS and SBCCS Parents | Breach of the EPC Agreement based upon the failure to achieve Commercial Operation. |
| 13 | Sureties [10] | Anticipatory breach of the $131,210,000 performance bond. |
| 14 | PFF, Landegger and LPRMT [11] | Breach of fiduciary duty |
| 15 | PFF, Landegger, SBCCS and SBCCS Parents | Fraud |
| 16 | Landegger, SBCCS, SBCCS Partners, SBCCS Parents, Bailey, Beck, Macaulay, Strasburg and Bach | Knowing participation in breaches of fiduciary duty committed by PFF. |
| 17 & 18 | Morrison Cohen & Feldman | Professional negligence (Count 16) and breach of fiduciary duty (Count 17) |
| 19 | Beck | Breach of the Independent Engineer Agreement. |
| 20 & 21 | Beck and Macaulay | Fraud (Count 20) and professional negligence (Count 21) |

SBCCS has moved to stay the adversary proceeding and compel arbitration,[12] and the other defendants [13] have sought related

**10.** The "Sureties" include the defendants Fidelity & Deposit Company of Maryland, St. Paul Fire and Marine Insurance Company, Seaboard Surety Company, and National Fire Insurance Company of Hartford. (*See* Complaint ¶ 2.)

**11.** "LPRMT" refers to the defendant and Landegger affiliate Landegger Paper Recycling Mill Trust. (Complaint ¶ 24.)

**12.** In addition, SBCCS seeks relief from the automatic stay to permit the pending arbitration to proceed.

**13.** Separate motions or joinders were filed by the following defendants: (1) SBCCS; (2) Fi-

stay relief, so that the dispute between the debtor and SBCCS can be submitted to arbitration.[14] Finally, defendants Morrison Cohen Singer & Weinstein, LLP, Joel Feldman, Beck and Michael Macaulay have moved to stay the adversary proceeding based on an October 3, 2001 order issued by a Pennsylvania court imposing a 90 day stay on any action in which the Reliance Insurance Company is obligated to defend a party. Beck and Macaulay have since withdrawn the motion, and the passage of time has rendered it moot.

## DISCUSSION

### A. Introduction

■ The Federal Arbitration Act ("FAA"), *see* 9 U.S.C. §§ 1 *et seq.*, requires a federal court to enforce an arbitration agreement and stay litigation that contravenes it.[15] *See* 9 U.S.C. §§ 2 & 3;[16] *Burns v. New York Life Ins. Co.*, 202 F.3d

616, 620 (2d Cir.2000) (citation omitted). The FAA signifies a "congressional declaration of a liberal federal policy favoring arbitration agreements," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The policy favoring arbitration is so strong that "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Id.* at 20, 103 S.Ct. 927; *accord Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)("[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation").

---

delity and Deposit Company of Maryland and National Fire Insurance Company of Hartford (the "Bonding Companies"); (3) Sea Crest Industries, Inc., Sea Crest Construction Corp., Peter Scalamandre & Sons, Inc., St. Paul Fire & Marine Insurance Co. and Seaboard Surety Co. (the "Sea Crest Defendants"); (4) Simons Engineering, Inc., AMEC E & C Services, Inc. and Peter Bailey (the "Simons Defendants"); (5) Carl C. Landegger, Pencor First Fiber, Inc., The Black Clawson Co., Black Clawson Partner, Inc., Michael Bach, Robert Strasburg and Landegger Paper Mill Recycling Trust (the "Landegger Defendants"); and (6) R.W. Beck. & Co. and Michael Macauley.

14. Certain of the defendants had also sought an order extending the time for them to respond to the Complaint. By order dated November 29, 2001, I extended that deadline until the later of 30 days following my decision on SBCCS's motion or 30 days after entry of a final non-appealable award in the pending arbitration.

15. The parties do not contest the applicability of the FAA to this case.

16. Section 2 of the FAA provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Section 3 states:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

■ Faced with a motion to compel arbitration, a court must apply a four part test: (1) did the parties agree to arbitrate, (2) does the dispute fall within their arbitration clause, (3) if federal statutory claims are raised, did Congress intend those claims to be arbitrable, and (4) if the court concludes that some but not all of the claims are arbitrable, should it stay the non-arbitrable claims pending the conclusion of the arbitration? *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987); *Norcom Elec. Corp. v. CIM USA Inc.*, 104 F.Supp.2d 198, 202 (S.D.N.Y.2000); *General Media, Inc. v. Shooker*, No. 97 Civ. 510(DAB), 1998 WL 401530, at *9 (S.D.N.Y. July 16, 1998). Each step involves a series of intermediate considerations.

■ The starting point is the parties' agreement. Assuming that their contract contains an arbitration clause, the latter's scope is a question of federal contract law. *Genesco*, 815 F.2d at 845; *see Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19–20 (2d Cir.1995). The court must consider the question in light of the allegations of the complaint, not the legal theories espoused. *Id.* at 20–21 (quoting *Genesco*, 815 F.2d at 846); *accord Norcom Elec. Corp. v. CIM USA Inc.*, 104 F.Supp.2d at 203–04. The first inquiry is whether the arbitration clause is "narrow" or "broad," *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir.), *cert. denied,* — U.S. ——, 122 S.Ct. 546, 151 L.Ed.2d 423 (2001); *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983), a distinction discussed in detail below. If the clause is broad, arbitrability will be presumed. *Louis Dreyfus*, 252 F.3d at 224; *Collins & Aikman*, 58 F.3d at 19.

■ On the other hand, a narrow clause focuses the court's inquiry on whether the dispute, " 'is on its face within the purview of the clause,' " or involves a collateral agreement or collateral issue "that is somehow connected to the main agreement that contains the arbitration clause." *Louis Dreyfus*, 252 F.3d at 224 (quoting *Rochdale Village, Inc. v. Public Serv. Employees Union*, 605 F.2d 1290, 1295 (2d Cir.1979)).[17] This demands a review of the factual allegations underlying the dispute to determine whether they implicate issues of contract construction or the parties' rights and obligations thereunder. If they do, the collateral dispute is subject to arbitration; otherwise, it is beyond the scope of the parties' agreement to arbitrate. *Collins & Aikman*, 58 F.3d at 23; *see Prudential Lines*, 704 F.2d at 64 (noting distinction between a non-arbitrable dispute that arises under a collateral agreement and an arbitrable dispute that arises under the main agreement but requires the determination of sub-issues). The party resisting arbitration has the burden of demonstrating that the dispute is collateral. *Prudential Lines*, 704 F.2d at 64.

■ If an arbitrable dispute involves a federal statutory right, the court must next decide if Congress intended to except the dispute from arbitration. "Like any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). The party opposing arbitration bears the burden of demonstrating that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 227, 107 S.Ct. 2332. This intent may be deduced

---

17. A "collateral agreement" is a separate side agreement connected to the contract containing the arbitration clause. *Prudential Lines,* 704 F.2d at 64.

" 'from [the statute's] text or legislative history' ... or from an inherent conflict between arbitration and the statute's underlying purposes.' " *Id.* (citations omitted); *accord Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 483, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The issue of waiver predominates arbitration disputes involving bankruptcy claims, and is discussed separately below.

 Assuming that some but not all of the claims are arbitrable, the court must last address whether to stay the balance of claims.[18] The court's power to grant a stay flows from its inherent power to control its docket, *see Citrus Mkting. Bd. v. J. Lauritzen A/S,* 943 F.2d 220, 225 (2d Cir. 1991), and the decision is committed to the court's discretion. *Genesco,* 815 F.2d at 856. "Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the non-arbitrable claims are of questionable merit," *id.; accord Norcom Elec. Corp. v. CIM USA Inc.,* 104 F.Supp.2d at 207, or the stay will "promote judicial economy, avoidance of confusion and possible inconsistent results" without working an undue hardship or prejudice against the plaintiff. *Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 838 (E.D.N.Y.1995)(quoting *Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc.,* 760 F.Supp. 1036, 1045 (E.D.N.Y. 1991)); *accord The Orange Chicken, L.L.C. v. Nambe Mills, Inc.,* No. 00 Civ. 4730, 2000 WL 1858556, at *9 (S.D.N.Y. Dec.19, 2000); *General Media, Inc. v. Shooker,* 1998 WL 401530, at *11; *see Moore v. Interacciones Global, Inc.,* No. 94 Civ.

4789(RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan.27, 1995) (a stay is appropriate when the non-arbitrable and arbitrable claims involve common questions of law and fact or when the arbitration is likely to dispose of issues common to the claims of the arbitrating and non-arbitrating defendants).[19]

## B. Arbitration in Bankruptcy Proceedings

When arbitration law meets bankruptcy law head on, clashes inevitably develop. In *Hays & Co. v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir.1989), the debtor was a former customer of the defendant. At the inception of their relationship, the debtor signed a Customer Agreement containing a broad arbitration clause. After the debtor filed for bankruptcy, the chapter 11 trustee commenced a civil action charging the defendant with (a) churning, (b) investing in speculative securities without disclosure of the risks and (c) commingling funds. He sought relief under federal and state securities laws, the common law, and fraudulent transfer law pursuant to 11 U.S.C. § 544(b). On the defendant's motion, the district court dismissed RICO claims and one securities law claim, but refused to compel arbitration of the remaining claims. *Id.* at 1150–51.

 The Circuit Court of Appeals reversed the district court's refusal to compel arbitration of the non- § 544(b) claims. Where the trustee sues as successor to the debtor, he is bound by an arbitration clause in the debtor's pre-petition contract. *Id.* at 1154. Given the strong

---

18. The court must stay the arbitrable claims between the contract parties. FAA § 3. The "stay" question discussed in the succeeding text concerns the non-arbitrable claims, either between the contract parties or other parties. These claims are not subject to the mandatory § 3 stay. *See Citrus Mkting. Bd.,* 943 F.2d at 225.

19. An arbitration proceeding may form the predicate for collateral estoppel. *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998).

federal policy favoring arbitration, a Court must enforce an agreement to arbitrate non-core claims brought by the trustee unless he shows that "the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause." *Id.* at 1156–57.

The Third Circuit concluded that the trustee had failed to satisfy his burden. Neither the Bankruptcy Code nor its legislative history indicated an intent to exempt the disputed claims from arbitration. *Id.* at 1157. In addition, although the Bankruptcy Code, as originally enacted, strove to centralize disputes before a single bankruptcy judge, the goal was substantially undermined by *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and the 1984 jurisdictional amendments. *Hays*, 885 F.2d at 1159–60. Those amendments granted the district court original but non-exclusive jurisdiction over actions and proceedings in bankruptcy, 28 U.S.C. § 1334(b), but also gave the district court the power to refer actions and proceedings to the bankruptcy court. 28 U.S.C. § 157(a)(1). Thus, notwithstanding the possibility of bifurcated or even trifurcated proceedings, or duplicative proceedings involving multiple parties, a court generally lacks the discretion to refuse to compel the arbitration of non-core claims. *See Hays*, 885 F.2d at 1161.

Several years later, the Fifth Circuit Court of Appeals addressed the bankruptcy court's discretion to refuse to compel the arbitration of a core proceeding, a question not considered in *Hays. In re National Gypsum Co.*, 118 F.3d 1056, 1066 (5th Cir.1997)(*Hays* makes "eminent sense" and is "universally accepted" with regard to non-core matters, but did not specifically address the discretion to refuse to compel the arbitration of core matters).

The Court rejected the argument that the core nature of the dispute, without more, created the type of "inherent conflict" with the FAA demanded by the Supreme Court precedent. *Id.* at 1067. Further, the arbitration of core proceedings did not, *ipso facto*, jeopardize the objectives of the Bankruptcy Code. *Id.* Thus, the analysis did not change. Nevertheless, where a cause of action was not derivative of the debtor's pre-petition legal or equitable rights, but arose entirely from rights conferred by the Bankruptcy Code, the bankruptcy court retained "significant discretion" to determine whether arbitration would be consistent with the purposes of the Bankruptcy Code. *Id.* at 1069.

Recently, the Second Circuit addressed whether arbitration of core and non-core proceedings conflicted with the Bankruptcy Code. In *United States Lines, Inc. v. American S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re United States Lines, Inc.)*, 197 F.3d 631 (2d Cir.1999), *cert. denied*, 529 U.S. 1038, 120 S.Ct. 1532, 146 L.Ed.2d 347 (2000), the Court discussed the standard for deciding whether to compel the arbitration of a core proceeding. Agreeing with *National Gypsum*, the Second Circuit stated that "a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration." *Id.* at 640. Instead, the standard applied by the *Hays* court to non-core proceedings governed. Accordingly, even if the proceeding was core, "the bankruptcy court must still 'carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing the arbitration clause,'" *id.* (quoting *Hays*, 885 F.2d at 1161), and the "arbitration clause should be enforced 'unless [doing so] would seriously jeopardize the

objectives of the Code.'" *In re United States Lines*, 197 F.3d at 640 (quoting *Hays*, 885 F.2d at 1161).[20]

Citing *Hays*, the *United States Lines* Court stated, in *dicta*, that non-core proceedings were "unlikely to present a conflict sufficient to override by implication the presumption in favor of arbitration." *In re United States Lines*, 197 F.3d at 640. The Court reinforced this observation in *Crysen/Montenay Energy Co. v. Shell Oil Co. and Scallop Petroleum Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160 (2d Cir.2000), *cert. denied*, 532 U.S. 920, 121 S.Ct. 1356, 149 L.Ed.2d 286 (2001). Upholding the bankruptcy court's power to stay non-core proceedings in favor of arbitration, *id.* at 166, the Court added that the bankruptcy courts generally lack the discretion to refuse:

> The issue in *U.S. Lines* was whether a bankruptcy court *may decline* to stay a *core* proceeding in favor of arbitration. As we noted there, the presumption in favor of arbitration generally will trump the lesser interest of bankruptcy courts in adjudicating non-core proceedings that could otherwise be arbitrated. We also explained that "even" in core proceedings, in which the interest of the bankruptcy court is greater, the bankruptcy court nonetheless *might* lack discretion to decline to stay in favor of arbitration. The unmistakable implication is that bankruptcy courts generally *do not* have discretion to *decline* to stay *non-core* proceedings in favor of arbitra-

tion, and they certainly have authority to grant such a stay.

*Id.* (emphasis in original).

Two recent district court cases applied these principles, reversing, in each instance, a bankruptcy court order refusing to compel arbitration. In *Pardo v. Akai Elec. Co. (In re Singer Co., N.V.)*, No. 00 Civ. 6793(LTS), 2001 WL 984678 (S.D.N.Y. Aug.27, 2001), the debtor and the defendant were parties to a pre-petition exclusive distributorship agreement that contained an arbitration clause. The defendant filed a proof of claim arising from that agreement, and the debtor filed an adversary proceeding seeking rescission, or alternatively, damages under the agreement. *Id.* at *1. The debtor's confirmed plan transferred its rights to a creditor's trust, and the trustee (Pardo) became the plaintiff. *Id.* at *2. The defendant moved to compel arbitration and stay the adversary proceeding. The bankruptcy court denied the motion in light of the core nature of the dispute,[21] the interrelationship between the issues raised by the proof of claim and the adversary proceeding, and the tension between the Bankruptcy Code policy of centralizing disputes and the decentralizing effect of compulsory arbitration. *See id.* at *5.

Reversing the bankruptcy court, the district court echoed the comments of *National Gypsum* and *United States Lines* that the core nature of the proceeding was not determinative. *Id.* at *5. Instead, observing that the issues between the parties were rooted in their pre-petition contractu-

**20.** The Second Circuit acknowledged that the centralization of disputes concerning a debtor's property is a "core purpose" of bankruptcy. Nevertheless, it adopted *Hays* reasoning that "by not granting the bankruptcy court exclusive jurisdiction over non-core matters, 'it is clear that in 1984 Congress did not envision all bankruptcy related matters being adjudicated in a single bankruptcy court.'" *Id.* at 640 (quoting *Hays*, 885 F.2d at 1157).

**21.** Core proceedings include the allowance or disallowance of claims against the estate, 28 U.S.C. § 157(b)(2)(B), and counterclaims asserted by the estate against persons filing claims against the estate. *Id.* § 157(b)(2)(C).

al relationship rather than rights arising under the Bankruptcy Code, the Court concluded that the arbitration of their disputes did not, standing alone, present an inherent conflict with the Bankruptcy Code. *Id.* at *6. Further, the adversary proceeding would not affect the allocation of assets, or, as the case had been confirmed, the ability to reorganize. *Id.* Finally, the issues raised both in the claim objection and adversary proceeding were subject to arbitration, and their interrelationship did not weigh against arbitration. *See id.*

Another district court judge reached a similar result in *Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108 (S.D.N.Y. 2001). The case concerned the debtor's leases (containing arbitration clauses) of facilities at the Port of Albany, and a related agreement to make payments in lieu of taxes (the "PILOT Agreement"). *Id.* at 113–14. Disputes regarding the debtor's failure to make payments under the PILOT Agreement suffused three proceedings: (1) an adversary proceeding by the debtor to avoid the PILOT Agreement for lack of consideration, or as a fraudulent transfer, and for an accounting, *id.* at 114, (2) the debtor's motion to assume the Port leases, *id.* at 115, and (3) a proof of claim filed by the City of Albany for taxes due under the PILOT Agreement. *Id.* The bankruptcy court agreed that the disputes were arbitrable, *id.*, but denied the motion to compel arbitration because the adversary proceeding was core, arbitration would adversely affect the underlying purpose of the Bankruptcy Code, and the adversary proceeding was a more expeditious means of resolving the dispute. *Id.* at 116.

The district court reversed, applying a two-step inquiry: did the bankruptcy court have discretion to refuse to compel arbitra-

tion, and if it did, would enforcing arbitration adversely affect an underlying purpose of the Bankruptcy Code. *Id.* at 118. The first step asks whether the proceeding is core. If the proceeding is non-core, the inquiry ends and the bankruptcy court lacks discretion to refuse arbitration. *Id.* Even if the proceeding is core, the bankruptcy court must still consider whether arbitration would jeopardize Bankruptcy Code policy. *Id.* The second step asks whether the underlying dispute concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities. In the former situation, the bankruptcy court has discretion to refuse arbitration, but in the latter it does not. *Id.* at 123–24.

The district court's two-step inquiry led to the conclusion that the bankruptcy court lacked discretion to refuse arbitration. The bankruptcy court had determined that the disputes, including the bankruptcy avoidance claims, were arbitrable. *Id.* at 116. Further, although the disputes were core, *see id.* at 121–23, they arose out of the pre-petition Port leases and the PILOT Agreement. *See id.* at 124. Finally, arbitration did not conflict with the bankruptcy policy favoring expeditious administration of the estate. Most of the delays were attributable to the bankruptcy court, and elevating the policy of expeditious administration would create an exception that would swallow up the rule, giving the bankruptcy court the discretion to refuse arbitration in every instance. *See id.* at 125.

The *Winimo* approach provides an appropriate framework for analysis, with some amplification. Assuming that the parties agreed to arbitrate the dispute, the bankruptcy court must consider whether it has any discretion to refuse to compel arbitration. Initially, the bankruptcy

court must decide if the proceeding is core or non-core. If the dispute is non-core, that will generally end the inquiry. The bankruptcy court will lack the discretion to refuse to compel arbitration.

■■■ If the matter is core, the bankruptcy court must still examine the nature and reason for its "coreness." Many proceedings are procedurally core; they are garden variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved. Objections to proofs of claim and counterclaims asserted by the estate, the types of core proceedings involved in *Singer* and *Winimo*, exemplify this type of matter. The arbitration of a procedurally core dispute rarely conflicts with any policy of the Bankruptcy Code unless the resolution of the dispute fundamentally and directly affects a core bankruptcy function. *See In re United States Lines*, 197 F.3d at 638–39.

■■■ Other proceedings are core for substantive reasons; they are not based on the parties' pre-petition relationship, and involve rights created under the Bankruptcy Code. As discussed below, such disputes will often fail the preliminary question of arbitrability because the parties did not agree to arbitrate them. Nevertheless, even if they are covered by the arbitration clause, it is more likely that arbitration will conflict with the policy of the Bankruptcy Code that created the right in dispute. The bankruptcy court enjoys much greater discretion to refuse to compel the arbitration of this type of dispute.

## C. Law of the Case

■■■ Before addressing the arbitration question, it is necessary to tackle the trustee's threshold argument involving law of the case. In the first Hagerstown case, SBCCS moved for relief from the stay to continue the arbitration before the debtor

ever filed its original complaint. By the time of oral argument, the debtor had filed its complaint, but SBCCS never modified its motion or moved specifically to compel arbitration. Thus, the only application before me at the time was one for stay relief.

I denied the motion. Despite the strong federal policy in favor of arbitration (Transcript of hearing, held June 30, 1998, at 87–88), I nevertheless concluded that it did not warrant relief from a statutory stay that undisputedly covered arbitration proceedings. (*See id.* at 89–90.) In addition, I conducted the balancing inquiry mandated by *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280 (2d Cir.1990), and concluded that the relevant *Sonnax* factors weighed in favor of denying stay relief. (*Id.* at 91–96.) The trustee now argues that SBCCS's current motion is simply a retread of its earlier motion, and should be denied under the doctrine of law of the case.

■■■ Under the law of the case doctrine, a court will generally not address issues that were litigated and decided in earlier proceedings in the same case. The doctrine is "based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States v. United States Smelting, Refining & Mining Co.*, 339 U.S. 186, 198, 70 S.Ct. 537, 94 L.Ed. 750 (1950); *accord Liona Corp. v. PCH Assoc. (In re PCH Assoc.)*, 949 F.2d 585, 592 (2d Cir.1991). Accordingly, a court will not ordinarily reconsider its own prior decisions, although it retains the discretion to do so. 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4478, at 789–92 (2d ed.1981)("WRIGHT & MILLER"); *see Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir.1996).

The issue raised by SBBCS's current motion differs from the earlier one. SBCCS never moved to compel arbitration in the first case, and I did not treat its motion as anything other than one for relief from the stay. Stay relief motions give a bankruptcy court considerable discretion, and I exercised that discretion based upon the application of the *Sonnax* factors.

The present motion affords me much less discretion—in fact, possibly none at all. *Sonnax* balancing does not apply, and the strong federal policy favoring arbitration trumps the usual considerations of judicial economy and efficiency which are important factors under *Sonnax*. Thus, arbitration may be required even though it will require several litigations and possibly lead to inconsistent results.

■ Even if I had decided this question, I would reconsider my earlier ruling. There are three generally recognized exceptions to the doctrine of law of the case: (1) an intervening change in controlling law, (2) the availability of new evidence and (3) the need to correct a clear error or to prevent a manifest injustice. *See Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992); 18 WRIGHT, MILLER & COOPER § 4478, at 790. The recent Second Circuit and district court decisions, which are discussed above and were decided after I denied SBCCS's motion for stay relief, have clarified and circumscribed the bankruptcy court's discretion to deny arbitration. Even if this did not change controlling law, these decisions would render undue adherence to my prior ruling a clear error. Moreover, I am less confident now that *Hays* is limited to situations in which the trustee has commenced an adversary proceeding for affirmative relief. (*See* Transcript of hearing, held June 30, 1998, at 89)(citing *In re FRG*, 115 B.R. 72 (E.D.Pa.1990)). *Hays* and its progeny may require arbitration even in defensive situations, such as where the trustee objects to the proof of an arbitrable claim.

Accordingly, I conclude that the doctrine of law of the case does not bar the consideration of SBCCS's motion to compel arbitration.

## D. The Arbitrability of the Claims Between the Trustee and SBCCS

■ The EPC Agreement provides for the arbitration of any dispute or matter that "arises ... under this Agreement." The clause is a narrow one, *see Prudential Lines*, 704 F.2d at 64 & n. 5 (clause pertaining to disputes that "arise under" the contract is narrow); *Rochdale Village*, 605 F.2d at 1296 (clause that pertains to "disputes hereunder" is broad but not unlimited); *Matter of Kinoshita & Co.*, 287 F.2d 951, 952–53 (2d Cir.1961)(clause relating to disputes that "arise under" the contract not broad enough to encompass claim that contract was fraudulently induced), and arbitration is limited to the "literal interpretation or performance of the contract." *Louis Dreyfus*, 252 F.3d at 226.[22] The narrow clause used in the EPC Agreement stands in contrast to paradigmatic broad

---

22. Decisions subsequent to *Kinoshita* have limited its precedential effect to its precise facts, *e.g.*, *Genesco*, 815 F.2d at 854; *S.A. Mineracao da Trindade–Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir.1984); *St. Paul Fire & Marine Ins. Co. v. Employers Reins. Corp.*, 919 F.Supp. 133, 135 (S.D.N.Y. 1996), and have left it in "tatters." *Id.* Nevertheless, the *Louis Dreyfus* Court observed that the distinction between the "arising under" language involved in *Kinoshita* and the "arising from" language in the case before it was more than a semantic one. *Louis Dreyfus*, 252 F.3d at 226. The *Kinoshita* phrase will continue to limit arbitration to questions of the literal interpretation or performance of the contract. *Id.*

clause that extends beyond disputes "arising under" a contract to disputes "relating to" or "in connection with" the contract. *Id.; see Collins & Aikman*, 58 F.3d at 20. Accordingly, there is no presumption of arbitrability. In each instance, it is necessary to decide, in light of the factual allegations in the Complaint, whether the dispute is covered by the arbitration clause, or otherwise implicates issues of contract interpretation or the parties' performance, and their corresponding rights and liabilities.

### 1. Breach of the EPC Agreement

██ Counts 11 and 12 allege breach of contract claims. According to Count 11, SBCCS failed to achieve Mechanical Completion for six reasons. First, the debtor and SBCCS never agreed on a Mechanical Completion Preliminary Punch List because the Owner's Representative's agreement to the so-called Preliminary Punch List was void for fraud. (Complaint ¶ 384.) Second, when SBCCS certified Mechanical Completion, the uncompleted work exceeded the "minor items" allowed under the EPC Agreement. (*Id.* at 385.) Third, SBCCS failed to accomplish all of its work in accordance with Good Industry Practice as defined in the EPC Agreement. (*Id.* at 386.) Fourth, the Facility never completed a full-volume operating test with water. (*Id.* at 387.) Fifth, SBCCS failed to perform its work in accordance with the Facility design reflected in Exhibit E to the EPC Agreement. (*Id.* at 388.) Sixth, Beck was not a truly independent engineer, and Beck's certification of Mechanical Completion was, therefore, invalid. (*Id.* at 389.)

Count 12 alleges a failure by SBCCS to achieve Commercial Operation. In particular, (1) the Plant failed the Seven Day Test, (2) the Punch List work outstanding on October 30, 1996 exceeded $1 million (and SBCCS failed to bond the completion costs), (3) SBCCS failed to deliver the documentation required by the EPC Agreement, (4) the Plant failed to achieve Commercial Operation by October 30, 1996 because there were outstanding Events of Default, and (5) SBCCS overstated inventories as of that date. (*Id.* at 395–401.)

The trustee apparently concedes the arbitrability of Counts 11 and 12 as asserted against SBCCS; he distinguishes them from the remaining nine counts, which he argues are not arbitrable. (*Trustee's Objection to SBCCS's Motion to Stay Adversary Proceeding as to SBCCS and to Compel Arbitration* 11.) In any event, Counts 11 and 12 concern claims between the debtor and SBCCS regarding the latter's performance under the EPC Agreement, and the parties' rights and obligations thereunder. Accordingly, they "arise under" the EPC Agreement, and are arbitrable. Further, they involve disputes arising from the parties' pre-petition contractual relationship, and are core solely for procedural reasons—they were raised as counterclaims in connection with the trustee's objection to SBCCS's proof of claim.[23] My discretion, if any, is extremely limited, and the arbitration of these counts will not conflict with any bankruptcy policy. Accordingly, I am required to compel arbitration, and issue a mirror image stay in the adversary proceeding of the trustee's claims under SBCCS under these Counts.

**23.** SBCCS filed a "defensive" proof of claim which, according to SBCCS, was intended to preserve its right to set off but did not seek affirmative relief. (Transcript of hearing, dated Nov. 14, 2001, at 18.) The parties have argued about the jurisdictional effect of the filing but the issue is immaterial to the resolution. SBCCS conceded at oral argument and solely for the purpose of this motion that all of the claims asserted against it in the Complaint were core, (*id.* at 24), arguing that arbitration was nevertheless compulsory.

Both Counts also name the SBCCS Parents as co-defendants under an alter ego theory. Since their liability is derivative of SBCCS's, these Counts will also be stayed as to the SBCCS Parents pending the conclusion of the arbitration.

### 2. Fraudulent Conveyance Claims

▇ The Complaint identifies three distinct fraudulent conveyances involving SBCCS. Counts 1 and 2 charge that the debtor fraudulently transferred its right to a mechanically complete Mill when it signed the Preliminary Punch List and related agreements. (Complaint ¶¶ 317–18, 323–25.) Counts 3 and 4 allege that the debtor fraudulently transferred its right to a Mill ready for Commercial Operation when it entered into the Commercial Operation Settlement. (Complaint ¶¶ 330–31, 336–38.) These four counts also name PFF, Landegger and the SBCCS Parents as transferees. Finally, Counts 6 and 7 argue that the debtor fraudulently incurred obligations and transferred rights by entering into the Cash Management Agreement. (Complaint ¶¶ 350–51, 356–58.)

▇ There is no agreement to arbitrate these claims, and hence, it is unnecessary to go beyond the first step in the analysis. A trustee in bankruptcy wears two hats. First, he stands in the shoes of the debtor, and may bring any suit that the debtor could have brought before bankruptcy. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir.1995); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991). When the trustee sues as statutory successor to the debtor, his rights are limited to the same extent as the debtor's under applicable non-bankruptcy law. If the debtor agreed in a pre-petition contract to arbitrate a dispute, the trustee, suing as successor to the debtor, is likewise bound by the arbitration clause. *Hays*, 885 F.2d at 1154; *Pardo v. Pacificare of Texas, Inc. (In re APF Co.)*, 264 B.R. 344, 363 (Bankr. D.Del.2001).

Second, under section 544,[24] the trustee also stands in the "overshoes" of the creditors. *Podell & Podell v. Feldman (In re Leasing Consultants, Inc.)*, 592 F.2d 103, 110 (2d Cir.1979); *Goldin v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318, 324 (Bankr.S.D.N.Y. 1996). With certain exceptions that are

**24.** Section 544 of the Bankruptcy Code provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with

respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1) . . . [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title. . . .

not germane, § 544(b) authorizes the trustee to avoid any transfer that an actual creditor holding an allowable claim could have avoided under applicable law. Under non-bankruptcy law, the debtor cannot sue to recover its own fraudulent transfers. Section 544(b), however, puts the trustee in the creditors' shoes, and allows him to assert claims that only they could assert outside of bankruptcy.

The claims inherited from the creditors are not arbitrable for the reasons explained in *Allegaert v. Perot*, 548 F.2d 432 (2d Cir.), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977). There, the trustee in bankruptcy of a defunct brokerage firm brought an adversary proceeding alleging violations of state law, federal securities law and New York fraudulent conveyance law. The district court stayed the litigation based upon a broad arbitration clause, but the Court of Appeals reversed. Addressing the fraudulent conveyance claims, the Court observed that they belonged to the creditors who could not have been compelled to arbitrate them. Accordingly, the trustee could not be compelled to arbitrate the fraudulent transfer claims while standing in their shoes. *Id.* at 436.

*Hays* followed *Allegaert*, and concluded that the trustee was not bound to arbitrate fraudulent conveyance claims because the creditors were not. The Court explained:

> Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to assert on their behalf. The Supreme Court has made it clear that it is the parties to an arbitration agreement who are bound by it and whose intentions must be carried out. [Citation omitted].... Thus there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative

from one who was a party to it. In this respect our conclusion is supported by *Allegaert*, 548 F.2d at 436 (With respect to those of the trustee's claims, such as fraudulent and preferential transfers, that arose under the Bankruptcy Act, the court stated that "[t]hese are statutory causes of action belonging to the trustee, not to the bankrupt, and the trustee asserts them for the benefit of the bankrupt's creditors, whose rights the trustee enforces."). It follows that the trustee cannot be required to arbitrate its section 544(b) claims and that the district court was not obliged to stay them pending arbitration.

*Hays*, 885 F.2d at 1155; *accord In re National Gypsum Co.*, 118 F.3d at 1068 (core proceedings involving the adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims are arguably beyond the coverage of most, if not all, arbitration provisions).

*Winimo* reached a contrary result, but the case is distinguishable. Quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the district court observed that fraudulent conveyance claims were arbitrable because they were essentially common law suits that resembled state contract claims, and were brought by the debtor to augment the bankruptcy estate. *In re Winimo Realty Corp.*, 270 B.R. at 124 n. 12. The bankruptcy court had held that all of the disputes were arbitrable, and that conclusion was apparently not challenged on appeal. Thus, the district court did not decide arbitrability, but instead, simply that compelling the arbitration of an otherwise arbitrable fraudulent conveyance claim would not seriously threaten the objectives of the Bankruptcy Code. *Id.* at 125.

Here, the trustee challenges the very arbitrability of the fraudulent conveyance claims. As the *Allegaert* and *Hays*

Court's held, the creditors were never parties to the contractual arbitration provisions, and therefore, did not agree to arbitrate these claims. The trustee stands in their shoes, and hence, did not agree to arbitrate them either. *See In re APF Co.*, 264 B.R. at 363.

I nevertheless conclude that the fraudulent transfer claims should be stayed against all of the defendants pending the conclusion of the arbitration. At their core, the trustee's claims against SBCCS are contractual in nature, relating to its performance under the EPC Agreement and resulting liability. The trustee contends that the Plant never reached Mechanical Completion or Commercial Operation, two contractual milestones. His contract claims look to disaffirm or avoid several agreements that resolved disputes surrounding SBCCS's performance, and facilitated the apparent achievement of these milestones. The fraudulent conveyance claims are directly connected to the contract disputes, and present alternative theories of disaffirmance.

For example, the trustee charges in Count 12, a breach of contract claim, that the debtor never agreed to a Preliminary Punch List because the consent of the Owner's Representative was induced through fraud. If the trustee succeeds in rescinding the Preliminary Punch List on that ground, he will not have to avoid it as a fraudulent conveyance. Similarly, although Count 13 does not expressly plead that the Commercial Operation Settlement was also fraudulently induced, it incorporates the previous allegations that do. (*See* Complaint ¶¶ 13(c), 165 n. 9, 167–99.)

The Cash Management Agreement relates to the post-October 30, 1996 period, and according to the trustee, was kept secret from the Owner's Representative. (*Id.* ¶ 188.) Hence, there is no claim of fraudulent inducement. Nevertheless, the Cash Management Agreement implicates two contract claims. First, the trustee maintains that its concealment fraudulently induced the Owner's Representative to sign the Commercial Operation Settlement. (*Id.* ¶ 189.) If the trustee proves this claim, the Cash Management Agreement would arguably become less significant if not immaterial since there would then be no post-Commercial Operation period. SBCCS would lose the benefit of the liquidated damages limitation that applied during the post-Commercial Operation period, and the trustee could assert the more substantial breach claim based upon the failure to achieve Commercial Operation. Second, even if the Plant had achieved Commercial Operation, SBCCS remained contractually liable for any operating shortfall, computed on a cash basis, during the ninety-one days following Commercial Operation. (*Id.* ¶¶ 181–82.) The trustee maintains, in substance, that the Cash Management Agreement enabled SBCCS to reduce its contractual liability, (*id.* ¶¶ 13(c), 185, 357–58), to the extent of at least $8.1 million. (*See id.* ¶¶ 354, 361.)

The arbitration and the fraudulent conveyance litigation also share common questions of fact. In the arbitration, the trustee will seek to prove the worth of his contract claims against SBCCS without regard to the effect of the three agreements he is trying to avoid. The trustee's fraudulent conveyance allegations state that the debtor did not receive "fair consideration" for these three agreements. (*Id.* ¶¶ 317, 330, 363.) The fairness of the consideration depends on the value of the contract claims that the debtor surrendered, the issue that the trustee will litigate in the arbitration. Accordingly, the arbitration may contribute to the resolution of the issues raised by the fraudulent conveyance claims.

The six fraudulent conveyance claims also name the SBCCS Parents on an alter ego theory, and Counts 1 through 4 join PFF and Landegger as well. These claims will also be stayed for the reasons already stated. First, any alter ego liability is derivative of SBCCS's liability. Second, the fraudulent conveyance claims are intertwined with the other contract disaffirmance claims. Third, the arbitration may assist in determining the fairness of the consideration.

### 3. The Turnover Claim

■ Count 10 seeks the turnover of property of the estate. It alleges that SBCCS has plant drawings which it was required to deliver to the debtor under the EPC Agreement. In addition, SBCCS (or Black Clawson, PFF or Landegger) retains certain of the debtor's books and records under its custody or control. Finally, Black Clawson, PFF or Landegger maintains custody or control over the debtor's spare parts and equipment. (Complaint ¶ 376.) The Complaint estimates that the aggregate value of this property equals or exceeds $985,000.00, and demands that these defendants account for and turn over the specific property or its value. (Id. ¶ 380.)

Putting the claim that SBCCS failed to deliver plant drawings as required by the EPC Agreement to one side, the turnover claim is not arbitrable. Black Clawson, PFF and Landegger are not parties to the EPC Agreement, and Count 10 does not indicate that the EPC Agreement required SBCCS to turnover the other books and records it allegedly possesses or controls.

Further, I question whether the trustee's turnover claim against SBCCS is subject to the parties' arbitration clause. Although it may overlap somewhat with the debtor's contract rights, the turnover claim is brought under § 542(a).[25] It is a creature of bankruptcy law, and only the trustee may bring it. *See Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs.)*, 272 B.R. 74, 97–98 (Bankr.S.D.N.Y.2002). In other words, the trustee did not inherit the turnover claim from the debtor, or bring it as statutory successor to the debtor. Like the fraudulent conveyance claims, the trustee cannot be deemed to have agreed to arbitrate it.

■ Even if the turnover claim against SBCCS was subject to the arbitration clause, I conclude that arbitration of this dispute should not be compelled. The turnover claim is core, *see* 28 U.S.C. § 157(b)(2)(E), and compelling arbitration of the trustee's turnover claim would conflict with important policies of the Bankruptcy Code. Under § 704 of the Bankruptcy Code,[26] the chapter 7 trustee is

---

25. Section 542(a) states:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

26. Section 704 states:

The trustee shall—(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest; (2) be accountable for all property received; (3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title; (4) investigate the financial affairs of the debtor; (5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper; (6) if advisable, oppose the discharge of the debtor; (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest; (8) if the business of the debtor is

directed to marshal, account for and liquidate the property of the estate, and close the estate as expeditiously as possible consistent with the best interests of the parties in interest. In addition, he must investigate the financial affairs of the debtor, examine proofs of claim, and where appropriate, object to their allowance, furnish information about the estate to parties in interest upon request, and render a final report and account.

To enable him to perform these duties, the Bankruptcy Code grants the trustee extraordinary rights and powers. He enjoys the status of a judicial lien creditor. *See* 11 U.S.C. § 544(a)(1). He may compel other people to turn over information bearing on the estate. *See* 11 U.S.C. § 542(e).[27] Custodians must turn over property of the debtor and account to the trustee. 11 U.S.C. § 543. Subject to providing adequate protection, the trustee may force others to surrender property in which they have an interest, *see United States v. Whiting Pools*, 462 U.S. 198, 211–12, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), and sell that property free and clear of those interests. 11 U.S.C. § 363(f). The trustee may assign executory contracts and unexpired leases even though contractual provisions prevent or restrict assigna-

bility, 11 U.S.C. § 365(f), or the use proposed by the assignee. *See In re U.L. Radio Corp.*, 19 B.R. 537, 544–45 (Bankr. S.D.N.Y.1982).

Arbitration of the turnover claim will conflict with the trustee's core obligation to marshal and liquidate the assets expeditiously, and investigate and report on the financial affairs of the debtor. Further, the debtor's contractual rights cannot limit the trustee's more extensive statutory powers to perform his duties. Accordingly, I decline to compel the trustee to arbitrate the debtor's right to recover plant drawings, books and records from SBCCS. Instead, he is entitled to exercise his broad bankruptcy powers in this Court under § 542 to compel the turnover of property of the estate and obtain recorded information in conformity with the Bankruptcy Code.[28] Further, he may pursue his turnover claims against the other defendants.

### 4. Fraud Claim

■ Count 15 joins fraud claims against SBCCS and the SBCCS Parents with distinct fraud claims against PFF and Landegger. The former include misrepresentations or concealments related to the achievement of Mechanical Completion,

authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and (9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

27. Section 542(e) states:
 Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books,

documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

28. This conclusion does not extend to the "turnover" of disputed choses in action under 11 U.S.C. § 542(b). Treating a "debt turnover" as a core matter may eviscerate the holding in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and raise constitutional problems. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1102 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994).

the passing of the Seven Day Test, the satisfaction of certain inventory requirements and the achievement of Commercial Operation. (Complaint ¶ 429.) The latter include a variety of matters concerning the construction and operation of the Plant as well as other agreements. (*See id.* ¶ 428.) Lumping all of the fraud together, the trustee alleges that the defendants' conduct induced the Owner's Representative to agree to the Preliminary Punch List and the Commercial Operation Settlement, and allowed the Plant to operate long enough for Landegger to reach an agreement in principle to sell the Shartle Division. (*Id.* ¶¶ 432, 434.) The trustee seeks compensatory and punitive damages, (*id.* ¶¶ 435–37), the imposition of a constructive trust, (*id.* ¶ 438), and an injunction against further dissipation of assets. (*Id.* ¶ 439.)

 A party cannot avoid an arbitration clause simply by casting its claim in tort. *Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd.*, 385 F.2d 158, 159 (2d Cir.1967); *see Collins & Aikman*, 58 F.3d at 23. Instead, the court must determine whether the tort claim is wholly independent of the contract. *Altshul Stern & Co.*, 385 F.2d at 159. Ignoring the legal theory, the trustee alleges, in substance, that SBCCS failed to meet the contract requirements relating to Mechanical Completion and Commercial Operation, but through improper means, either coopted or duped others into agreeing that it had met the requirements, or into settling any disputes that it had. If SBCCS fraudulently

induced the Owner's Representative to settle the disputes relating to Mechanical Completion and Commercial Operation—arbitrable issues—it follows that SBCCS failed to achieve either milestone and breached its obligations under the EPC Agreement. The fraud claims against SBCCS are, therefore, arbitrable.[29]

As a result, the motion to compel arbitration of the fraud claims asserted against SBCCS is granted, and these claims are stayed. As noted, Count 15 includes other fraud claims against other parties. Obviously, these parties did not agree to arbitrate. Accordingly, they will be severed, *see Collins & Aikman*, 58 F.3d at 20 (in the proper case, the court can sever the arbitrable part of the claim from the non-arbitrable part), and dealt with separately below.

## 5. Knowing Participation in Breach of Fiduciary Duty

 Count 16 alleges that numerous defendants knowingly participated in PFF's breach of its fiduciary duties imposed under the Partnership Agreement. Count 16 lists thirteen offending actions or courses of conduct, and attributes seven to SBCCS (as well as other defendants). The charges include hiding the secret amendment to the Independent Engineer Agreement (Landegger, SBCCS Partners, SBCCS Parents, Bailey)[30], corrupting the Independent Engineer's loyalty by helping Beck obtain Efficacy Insurance (Bailey, SBCCS Partners and SBBCS Parents), ex-

---

**29.** Although the EPC Agreement contains a narrow arbitration clause like the one in *Kinoshita* where the Court held that a fraudulent inducement claim was not arbitrable, the latter case is distinguishable. In *Kinoshita*, the party opposing arbitration contended that the contract containing the arbitration clause was fraudulently induced. Here, the trustee does not challenge the EPC Agreement. Rather, he contends that subsequent settle-

ments of disputes under the EPC Agreement were fraudulently induced. These issues are intertwined with the question of SBCCS's performance. Further, as noted, *Kinoshita* is limited to its facts.

**30.** The names within the parentheses identify the other defendants charged with the same wrongful conduct.

pediting the achievement of Mechanical Completion through secret side deals (Landegger, Bailey), changing the test protocols and then hiding the failure of the Seven Day Test (Landegger, Bailey, Beck, Macaulay), executing the Cash Management Agreement and MIS Side Agreement (Landegger, Bailey) and running the Plant during the ninety-one day post-Commercial Operation period for SBCCS's benefit at the expense of the debtor (Landegger, SBCCS Partners, SBCCS Parents, Bailey, Bach, Strasburg). (Complaint ¶ 442.)

The claims asserted against SBCCS in Count 16 are not arbitrable, and *Genesco,* while not directly on point, is analogous. There, Genesco contracted to buy fabrics from the defendants pursuant to contracts containing arbitration clauses. 815 F.2d at 843. Genesco alleged that in connection with the sales, the defendants tortiously interfered with the contractual relationship between Genesco and one of its executive officers through repeated acts of commercial bribery. *Id.* at 856. The Court held that the tortious interference dispute did not "arise under" or "relate to" the sales agreements, but instead, related to the executive's employment agreement. The dispute was not, therefore, arbitrable. *See id.; accord Collins & Aikman,* 58 F.3d at 22; *Altshul Stern & Co.,* 385 F.2d at 159. Here, the trustee presents a similar claim; SBCCS interfered with PFF's faithful performance under the separate and distinct Partnership Agreement. For the reasons analogous to those stated in *Genesco,* these claims are not arbitrable.

Nevertheless, the "knowing participation" claims interposed against SBCCS should be stayed. The allegations implicating the Independent Engineer concern SBCCS's circumvention of its performance

obligations. In particular, the trustee alleges that SBCCS used the dishonest Beck to change the test procedures and to certify satisfaction of the contractual requirements for Mechanical Completion and Commercial Operation.

The allegations regarding Mechanical Completion, the Seven Day Test and the ninety-one day period following Commercial Operation are also intertwined with SBCCS's performance under the EPC Agreement. The concealment of the MIS Side Agreement and the Cash Management Agreement form part of the claim that SBCCS fraudulently induced the Owner's Representative into executing the Commercial Operation Settlement. In addition, the MIS Side Agreement and the Cash Management Agreement purport to limit SBCCS's liability under the EPC Agreement. Thus, SBCCS's alleged breach of contract predominates these allegations, and as already noted, the arbitration of the underlying contract claims may advance their determination. Finally, the same rationale warrants a stay of the identical claims against the co-defendants.

### E. Claims Against the Non-SBCCS Defendants [31]

#### 1. The Sureties

 Count 13 alleges a claim against SBCCS's sureties for anticipatory breach of contract. The Sureties issued a performance bond in the debtor's favor in the amount of $131,210,000.00, binding themselves with SBCCS for the performance of the EPC Agreement. (Complaint ¶ 406.) Their liability depends, *inter alia,* upon a finding that SBCCS, as the general contractor, failed to perform. Accordingly, Count 13 is stayed pending the completion

---

**31.** The non-SBCCS defendants are not parties to the EPC Agreement or its arbitration clause. Accordingly, the claims asserted against them are not arbitrable, and the only question is whether they should be stayed.

of the arbitration. *See Institute of Mission Helpers v. Reliance Ins. Co.*, 812 F.Supp. 72, 76 (D.Md.1992).

## 2. Beck

 Count 5, denominated a fraudulent conveyance claim, alleges that Beck entered into the amended Independent Engineer Agreement "to intentionally hinder, delay, and defraud the Bondholders" by enabling SBCCS to tender a Plant that never achieved Mechanical Completion or Commercial Operation due to construction deficiencies and design defects. (Complaint ¶ 344.) Assuming that this states a fraudulent conveyance claim on behalf of anyone, let alone the trustee, the claim will be stayed. It is connected to the trustee's overarching claim that SBCCS failed to perform under the EPC Agreement, and passed off the defective Plant to the debtor through various wrongful acts.

As noted above, Beck is also implicated in Count 16, the "knowing participation" claim. The allegations involving SBCCS as well as Beck have already been addressed. In addition, Count 16 alleges that Beck assisted PFF in secretly amending both the Independent Engineer Agreement and the Bulkley Dunton Agreement. Landegger participated in both acts, and Strasburg collaborated in the latter. (Complaint ¶ 442.) The portion of Count 16 directed at the secret amendment to the Independent Engineer Agreement is stayed because, like the concealment of that amendment, it concerns SBCCS's breach of its performance obligations, and its efforts to pass off the defective Plant. If SBCCS performed its obligations, the debtor was not injured. The charges relating to the amended Bulkley Dunton are not stayed, however, for the reasons discussed below.

Count 19 asserts a claim for breach of the Independent Engineer Agreement. The specific breaches include amending the Independent Engineer Agreement, (¶ 468(a)) and assisting SBCCS to obtain Efficacy Insurance, (¶ 468(b)), both of which were discussed in connection with the "knowing participation" claim. Similarly, certifying Mechanical Completion, (¶ 468(e)), and concealing the failure of the Seven Day Test by falsely certifying its passage, (¶ 468(f),(I)), were considered at length above. Finally, agreeing that SBCCS achieved milestones, which entitled SBCCS to Milestone Payments under the EPC Agreement, (¶ 468(c)), and failing to disclose the true magnitude of the Mill's defects, (¶ 468(*l* )), like these other contentions, relate to SBCCS's contractual performance, are clearly connected to the claim that SBCCS did not perform, and are stayed.

Several of the allegations relate to change orders and contract amendments (collectively, the "Changes"). The trustee maintains that Beck breached the Independent Engineer Agreement by certifying that Permitted Change Notice ("PCN") # 8, PCN # 9, Contingency Change Order ("CCO") # 11 and Amendment No. 2 would not have a material adverse effect on the Project. (¶ 468(d),(g),(j).) PCN # 8 pertained to the requirements for Mechanical Completion. (*See* Complaint ¶ 227.) PCN # 9 concerned a dispute involving the MIS, and resolved an issue regarding which items to include on the Preliminary Punch List. (*Id.* ¶ 193.) CCO # 11 involved a change in the Seven Day Test procedures. (*Id.* ¶ 157.) Lastly, Amendment No. 2 to the EPC Agreement changed the Sludge Moisture Performance Guarantee, (*id.* ¶ 468(j)), and was part of the Commercial Operation Settlement. (*Id.* ¶ 165 n. 9.)

The parties' submissions do not explain whether these claims, based upon a sepa-

rate contract, depend on SBCCS's breach, or can proceed even if SBCCS did not breach the EPC Agreement. However, examination of Count 20, discussed below, shows that the Changes are intertwined with the trustee's claims that the debtor was fraudulently induced to agree to the Preliminary Punch List and Commercial Operation Settlement. (*See id.* ¶ 474.) The claims between the trustee and SBCCS regarding these issues are arbitrable, and the related claims involving Beck are therefore stayed.

Count 19 also alleges that Beck falsely certified that the amendment to the Bulkley Dunton Agreement would not have a material adverse effect. (Complaint ¶ 468(k).) This claim is not stayed as discussed more fully below.

Count 20 charges that Beck and Macaulay defrauded the debtor by making false representations or concealing facts. The fraud claim repeats most of the Count 19 contract claims, minus the allegations regarding the amendments to the Bulkley Dunton and Independent Engineer agreements. Thus, the fraud relates to the certification of the Changes, (*id.* ¶ 471(a),(d),(g)), the certification of Mechanical Completion, (*id.* ¶ 471(b)), and the failure to achieve Commercial Operation, including the modification of the test procedures, the certification of the Seven Day Test and the concealment of the failure to pass the Seven Day Test. (*Id.* ¶ 471(c),(e),(f).) The fraud was designed to and actually did induce the Owner's Representative to agree to the Preliminary Punch List and/or the Commercial Operation Settlement. (*Id.* ¶¶ 474–75.) Absent the fraud, the Owner's Representative would not have agreed to either, and would

have ordered the Mill to shut down long before April 1997. (*Id.* ¶ 476.)

The Count 20 fraud claims raise the same fraudulent inducement issues regarding the Preliminary Punch List and the Commercial Operation Settlement as the arbitrable claims lodged by the trustee against SBCCS. Accordingly, the Count 20 fraud claims will be stayed.

Finally, Count 21 asserts a claim of professional negligence against Beck and Macaulay based on the same allegations that underlie the breach of contract and fraud claims. (*See id.* ¶ 482.) The disposition of this Count is the same as the other two. All of these claims are stayed except for the claim relating to the Bulkley Dunton Agreement.

### 3. The Remaining Defendants and Claims

#### a. The Stayed Claims

The foregoing disposes of most of the defendants and claims, but portions of Counts 15 and 16, which have already been discussed, and Counts 8, 9, 14, 17 and 18, which have not, must be considered. Many of the allegations in Counts 14, 15, 17 and 18 are connected with the claims that the trustee must arbitrate with SBCCS. They involve the Mechanical Completion and Commercial Operation issues discussed above, and generally, focus on the corruption of the Independent Engineer, (*see* Count 14, ¶ 419(a); Count 15, ¶ 428(a); Count 17 [32], ¶ 453(a)) the Preliminary Punch List and the secret side letter agreements, (*see* Count 14, ¶ 419(b); Count 15, ¶ 428(b); Count 17, ¶ 453(b)), the failure of the Seven Day Test, (Count 15, ¶ 428(c)), the MIS Side Agreement, (Count 15, ¶ 428(e)), and running the Plant during

---

**32.** Count 17 alleges a claim of professional negligence against Morrison, Cohen & Feldman, based on the allegation in paragraph

453. Count 18, sounding in breach of fiduciary duty, relies on the same acts set forth in Count 17. (Complaint ¶ 460.)

the ninety-one day period for the benefit of SBCCS rather than the debtor, including the execution of the Cash Management Agreement. (*See* Count 14, ¶ 419(d); Count 15, ¶ 428(d); Count 17, ¶ 453(c)). For the reasons already discussed above, these claims, or parts of claims, are stayed.

#### b. The Unstayed Claims

The balance of the allegations do not deal with SBCCS's performance, or with one *caveat*, its liability under the EPC Agreement. The trustee contends that Landegger ran the Plant at a loss for six months following Commercial Operation to showcase the deinking technology and equipment of Black Clawson's Shartle Division. While this period overlaps with the 91–day period following Commercial Operation, the Complaint alleges separate and distinct wrongful conduct involving different contracts, and the arbitration will not resolve most, if any, of these issues. The claims in this category relate to the execution of the Revenue Shortfall Waiver, (Counts 8, ¶ 366; Count 9, ¶ 372), running the Plant to enhance the saleability of Shartle, (*see* Count 14, ¶ 419(e); Count 15, ¶ 428(d); Count 16, ¶ 442), misrepresenting the projected costs of repairs, (Count 15, ¶ 428(f)), and the actions taken in connection with the eventual shutdown of the Mill and the destruction of documents. (Count 14, ¶ 419(f); Count 16, ¶ 442.)

Finally, the charges pertaining to the United Container Agreement and the amended Bulkley Dunton Agreement, and more generally, the sale of the Mill's pulp will not be stayed. (*See* Count 14, ¶ 419(c); Count 15, ¶ 428(g)-(j); Count 16, ¶ 442; Count 17, ¶ 453(d)-(f).) They are not connected to the claims arising under the EPC Agreement that the trustee has asserted against SBCSS, do not share material, common questions with the arbitrable issues, and the arbitration will not resolve them.

#### F. SBCCS's Alternative Motion For Stay Relief

 By separate motion dated October 17, 2001, SBCCS moved in the alternative for stay relief. The automatic stay, 11 U.S.C. § 362(a)(1), enjoins the commencement or continuation of lawsuits *against the debtor*, including counterclaims asserted against the debtor in a lawsuit initiated by the debtor. *Koolik v. Markowitz*, 40 F.3d 567, 568 (2d Cir.1994). It does not stay the prosecution of claims brought *by the debtor. See Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 516 (2d Cir.1998).

 The automatic stay does not restrain the prosecution of the trustee's claims for affirmative relief, either in this Court or another court, or by way of counterclaim in the arbitration. It is true that SBCCS commenced the arbitration, apparently for a declaration regarding its liability arising during the ninety-one day period following the purported achievement of Commercial Operation. (*See Declaration of Michael Schatzow, Esq.*, dated Aug. 8, 1991, at ¶ 7.) This claim, which does not seek affirmative monetary relief against the debtor, is intertwined with the trustee's arbitrable claims, and is itself arbitrable. Thus, although not the precise object of its motion for alternative relief, SBCCS is entitled to relief from the automatic stay, to the extent necessary, to prosecute its claim in the arbitration. This will allow the arbitrators to resolve all of the arbitrable claims in one proceeding.

#### CONCLUSION

The motions to compel arbitration and stay the adversary proceeding are granted in part and denied in part. SBCCS's motion for relief from the stay is granted to

permit it to prosecute its arbitration claim for declaratory relief. The parties are directed to contact chambers to arrange a scheduling conference covering the continued litigation of the unstayed matters.

Settle order on notice consistent with this opinion.